## LARRISON et al. v. UNITED STATES.

Circuit Court of Appeals, Seventh Circuit.
January 7, 1928.

No. 3960.

1. Criminal law ⬤⟶1028—Consideration of questions other than presented to District Court held not permissible on writ of error.

Circuit Court of Appeals on writ of error cannot consider questions other than those presented to District Court, and must determine the assignments of error on record as made therein.

2. Post office ⬤⟶49(14)—Evidence held to support conviction for burglary of post office.

In prosecution for burglary of a post office, evidence *held* sufficient to support conviction.

3. Criminal law ⬤⟶510—Accomplice's unsupported testimony may sustain conviction.

Unsupported testimony of an accomplice is sufficient to sustain a conviction.

4. Criminal law ⬤⟶941(1)—New trial should not be denied merely because testimony admitted by witness to have been false was merely cumulative.

Court should not necessarily deny motion for new trial for newly discovered evidence, consisting of affidavit of witness disputing testimony given on trial, merely because perjured testimony is cumulative, since, although such fact should be considered, it is not conclusive.

5. Criminal law ⬤⟶1181—Return of record for motion for new trial on witness' affidavit that testimony was false held denied under circumstances.

Motion to return record to District Court for purpose of moving for a new trial for newly discovered evidence, based on affidavit of witness that testimony given at trial was false, *held* denied, in view of opposing affidavits by the same witness and fact that testimony was merely cumulative.

In Error to the District Court of the United States for the Southern Division of the Southern District of Illinois.

Ray Larrison and others were convicted for the burglary of a post office, and they bring error. Affirmed.

D. H. Mudge, of Edwardsville, Ill., and A. M. Fitzgerald, of Springfield, Ill., for plaintiffs in error.

Walter M. Provine, of Springfield, Ill., for the United States.

Before EVANS, PAGE, and ANDERSON, Circuit Judges.

EVAN A. EVANS, Circuit Judge. This prosecution grew out of a post office burglary at Alton, Illinois, May 12, 1924. Defendants were charged, in an indictment containing eight counts, with feloniously breaking into a post office with intent to commit larceny, with intent to steal postage stamps, and moneys, and property of the United States, with intent to damage and destroy certain doors, safes, and vaults in the post office, with having stolen thirty-three thousand eight hundred sixty-eight dollars and sixty-nine cents ($33,868.69) in stamps and money et cetera. They were convicted on three counts. Each was sentenced to serve a term in the penitentiary.

They here insist that the evidence is insufficient to sustain the conviction. Other assignments of error are presented, but they are not seriously urged.

They also present certain affidavits upon which they predicate a motion for leave to return the record to the District Court that they might move that court to set aside the verdict and grant a new trial because of the newly discovered evidence set forth in the affidavits.

Inasmuch as the contention that the evidence is insufficient to support the verdict is based upon the weakness of the testimony of an accomplice named Merrill, and inasmuch as the affidavit upon which the motion to return the record is based is one wherein Merrill disputes his oral testimony, it becomes necessary to set forth the evidence rather elaborately.

On May 12, 1924, the United States post office at Alton, Illinois, was burglarized and $33,868.69 in stamps and money taken from the safe. The safe was blown open by placing soap around the door and pouring in nitro-glycerine. The acetylene tank, the claw-bar and the tamping pick were left in the post office. The burglary occurred about 2 a. m., Monday morning.

Defendants resided in the vicinity of Alton or had so resided for years back. They were all well acquainted, and had been for years.

Defendant Larrison was 35 years old and had operated a soft drink parlor known as the Cadillac Bar. His place of business had been closed upon the motion of the government due to violations of the National Prohibition Act.

Defendant "Jackie" Adams was a professional safe blower residing near Chicago. He hailed from Alton. He did not testify.

Defendant Joseph Melling did not testify.

Defendant Robert Dooling was an ex-soldier who suffered disabilities during the war and received disability insurance. He testified and denied his guilt.

Defendant Joseph Marino in the summer of 1924 conducted a pool room. In 1924 he was indicted for murder.

Defendant Joseph Meyer was a saloon keeper and, after the prohibition amendment became effective, conducted a so-called soft drink parlor which was closed by order of the court upon complaint of the government. Thereafter he was in the automobile, tire, and accessory business and "ran a blind pig."

Benjamin Simon's occupation at the time of the burglary was not given, but previously he had worked as hod carrier, boiler maker's helper, had been a bar tender and was a soldier in the late war.

The two principal witnesses for the government admitted the existence of penitentiary records. One was James Kirby, who stated that he had completed three penitentiary sentences, one in California and two at Leavenworth. He was under a fourth sentence and serving his time in the Federal Penitentiary when he testified in this case. He stated that while being taken to the penitentiary the last time he jumped from the moving train and escaped. He shortly thereafter appeared at Alton. By profession he was a safe blower. He went to the Cadillac Bar, where Larrison invited him to join the party that was about to burglarize the post office. He was told that they were looking for a "Pete" man, meaning a safe blower, and he promptly accepted the invitation.

Shortly thereafter Kirby went with Merrill (alias Sturm) to the post office to look over the ground and examine the safe. A few days thereafter he was captured by the federal authorities and taken to the penitentiary. His guilty participation in the burglary came to an end.

George Merrill (alias George Sturm) was the other accomplice who testified at length upon both trials. He likewise made certain affidavits—one for the defendants upon which they ask that the record be returned to the District Court; the others for the government wherein he states he was induced for a money consideration to make the affidavit for defendants which in his two later affidavits he says was false.

Merrill is by occupation a thief; his residence for about 10 years prior to the trial, the various jails. He could not remember all the jails he had dwelt in. While stealing was his occupation and the jail his abode, he boasted of having engaged in other criminal transactions. He testified that he accompanied Kirby to the post office to view the safe and to study the lay of the ground.

After Kirby was captured and taken to the penitentiary, the plans for the burglary were stayed while the parties searched for a new "Pete" man. Defendant "Jackie" Adams was finally selected and Simon and Merrill interviewed him. He hesitated at first, saying "he did not want to fool around with any small stuff."

The next night, however, he appeared at the Cadillac Bar and joined in the enterprise. Defendants Merrill, Meyer, Dooling, Larrison, Marino and Simon were all present at this meeting. Melling arrived a little later. The plans were discussed and matured.

Merrill further testified that all expected the safe would produce a large sum of money ($90,000)—a pay roll shipment of money believed to be in the post office safe at the hour chosen.

On the evening chosen, the parties assembled. Melling furnished the car. Merrill was one of the outside watches—Simon, Larrison and Adams entered the post office. Dooling acted as another outside guard. About 2:35 the parties came out of the post office and the car was driven to Marino's and the stamps were "dumped" on the table, the amount being over $35,000. A short time thereafter some of stamps were sold by Larrison, who divided $5,000, $200 being paid to Meyer, and $800 being paid to all of the others, except Marino, who refused his share.

Defendants offered little or no testimony outside of their own statements. No character witnesses were offered by any of them. Several of them did not take the witness stand.

In corroboration of Merrill's testimony it appeared that a witness, March, testified that he was in the automobile business; that about ten days after the burglary Larrison sold him an acetylene torch; and witness sold it to a garage man by the name of Gerson. Subsequent to the indictment, defendant Meyer went to March and asked him if he had bought a torch from Larrison. March replied that he did not care to discuss the matter. A couple of weeks later, defendants Meyer and Marino sought March and asked what became of the torch that he had bought of Larrison. March replied that he did not care to discuss the matter, whereupon Meyer said, "You ——— you, are just as guilty of this as I am." Gerson testified that the torch offered in evidence was the one he bought from March. The torch was such a one as was used in blowing the safe.

Turley, another witness, testified to a conversation with "Jackie" Adams while both were in the Peoria jail. Adams was asked about the "rap" (the burglary) and Merrill's

"stooling" (confessing). He said, "It was a good 'rap,' but why should a man take a good 'rap' on account of Merrill's 'stooling.'"

Merrill in his cross-examination was confronted by a check for $1,200, payable to him and drawn by one Fishman. He stated, "That was a check for some 'hot diamonds' that Bob Dooling and Benny Simon had. The check was made payable to me because Simon was afraid to have it made out in such a large amount to him. It might cause suspicion going through the bank." This statement was disputed by Simon, who stated that Merrill told him the check was for some moonshine liquor which Merrill had delivered to a man; that he (Simon) had furnished a car for Merrill to go to Springfield to get the money, for which Merrill had agreed to pay him $50. He said his intimate association with Merrill arose out of his efforts to help Merrill collect this money.

Kirby's testimony was corroborated in a minor matter, which was, however, significant. He described his actions during the days following his escape from the United States marshal and while he was helping to plan the post office robbery. He said he always looked in the window before entering a building. One night, shortly before the burglary as planned, he looked in the window of a road house and saw two government officials —one the deputy marshal and the other a government investigator whom he knew. He withdrew. The deputy marshal testified that he and the government agent were at the road house on the night so fixed and in search of Kirby.

Upon the first trial, the jury disagreed. On the second trial, defendants' counsel examined both Merrill and Kirby freely. Such contradictions as occurred in the testimony of either witness were, on the whole, limited to unimportant matters.

When the case was presented to this court, defendants presented an affidavit of Merrill. In view of its importance, it is herewith reproduced.[1]

[1] I, George Strum, #1299, confined in the Illinois State Penitentiary, Joliet, Illinois, of my own free will and accord, without any prejudice or promises whatsoever, want to make a full statement of misrepresentation I have made heretofore. I want to make this statement in view of the fact that I have heretofore given testimony in the Federal Court at Springfield, Illinois, in the case of the United States versus Ray Larson and others, which was false and untrue, and by reason of which certain men have been wrongfully convicted, and sentenced to the United States Penitentiary at Leavenworth, Kansas:

About two months ago I wanted to get a

The government was given a short time to meet this affidavit. It produced two affidavits by Merrill also herewith reproduced.[2]

special letter out to Joe McGlynn, a lawyer in East St. Louis, who was one of the Attorneys for the defendants in this case, but was unable to do so. I received a visit from one of my friends, and I asked him to get in communication with Joe McGlynn, and have him come to see me so that I could make a full, fair statement of what the real facts in the case were.

The first time I heard of the Alton Post Office robbery was in September 1925, when Joe Schrader, a private detective in East St. Louis, asked me what I knew about the Alton Post Office burglary, I told him I didn't know anything about it; he said "As long as you are going to operate in East St. Louis you better know something about it," and then I left him. While I was put in jail in Marion, Illinois, I was approached by two Post Office Inspectors, Rona Keefe and Herbert Theurer, they were brought up to me by Sheriff Galligan; the Inspectors asked me about the Alton robbery, saying that Joe Schrader told them that I was one of the men implicated in it, I told them "No, I was not in on it." So I guess two months later, just before Christmas, while I was still in jail they came back again, and told me they were going to get me out of that rap, and for me to meet them in East St. Louis the following day. I was let out of jail Christmas Eve, I think it was, in 1925, and I met them later in East St. Louis, Keefe, Theurer and Schrader, we met there in Joe Schrader's office, and they told me they got me out of the rap down here alright, and if I didn't want to do a lot of time in Leavenworth that I better do what they told me; I told them that I had not known anything about it, but that I would go ahead and help them and do what they said.

In January, along about the 5th, I went to Alton, I was taken there by Schrader, and on the way there he explained who was responsible for the Alton robbery, and he went on to name the defendants, Larson, Dooling, Meyers, Marino, Melling, Adams and Simon; he asked me if I knew any of these parties, I told him I knew Larson, Dooling and Marino, so he said "Get acquainted with the rest of the mob so that you will be able to identify them in Court;" so I stayed in Alton several days, and met Joe Meyers and Simon. I never met Adams until I was in the Peoria jail February 1926. I explained to Post Officers Inspectors Keefe and Theurer that I did not know Meyer and Simon or Adams, and Keefe gave me the money with which to go to Alton so that I could get acquainted with them, and be able to identify them. I was in Alton five or six days, and I would meet Keefe, Theurer and Schrader at the Alton Post Office and report to them. Another purpose of my visit that I might acquaint myself with these different places so that I might describe them in my testimony.

At the direction of Keefe, Theurer and Schrader I brought Bennie Simon to Springfield in the early part of January, and he was to be arrested by the Post Office Inspectors. For some reason unknown to me, they did not arrest him so we came back to Alton, I was there a day or two when Theurer, Keefe and Schrader

[2] See note 2 on following page.

The recantation of Merrill and his subsequent repudiation of this recantation brought forth numerous other affidavits from the defendants as well as from the government. They are far too long to be here reproduced. Generally speaking, it may be said that de-

came in to Doug Knowles barber shop and got me and brought me up to the Post Office, where they handed me a typewritten statement already prepared before hand, and had me sign it in the presence of the Post Master, they gave me a copy for my own personal use so that I might familiarize myself with it. That afternoon we drove down to the old Custom House in St. Louis, and the next day Keefe and Theurer took me to Springfield, where I testified before the Grand Jury. They then released me and I went home.

About a week later I was arrested in Maywood, Illinois, and taken to Aurora jail, where I stayed about twenty days, then Keefe and Theurer came with several other Post Office Inspectors and fixed the charge against me, but I stayed in jail until they could get a court order to have me apprehended as a material witness, and I was taken from the Aurora jail on February 21st by Ned Dressendorfer and his brother to Springfield, Illinois, where I laid in jail one night, and on Washington's Birthday, February 22nd, I was taken to the Peoria jail. When I got to the Peoria jail they put me in the cell with Jackie Adams, and this was the first time in my life that I ever saw him. I stayed there in jail from February to October, and Keefe and Theurer were up to see me two or three times, and gave me some extra money over and above my dollar a day as a material witness for the Government.

I was taken from the Peoria jail on the morning in October when the case was first started to be tried at the Post Office Inspectors office in the Federal Building at Springfield, and was shown the tarpaulin, rain coat, and billiard table cover, and this was the first time I had ever seen any of these articles, they were taken from there to the District Attorney's office. I then testified in the trial of the case, and my testimony was false and untrue, as I positively did not then know, or do I now know, nor have I ever known, anything about the Alton Post Office burglary, or any connection of the defendants in that trial with the Alton Post Office burglary.

While we were in Springfield during this trial I stayed at the Leland Hotel with Jack Kirby, Byron Shelton, and the Post Office Inspector, and also a squad of police from St. Louis. While we were in Springfield, Jack Kirby said to me that he could help himself if he could testify against the defendants in the Alton Post Office case, he asked me to give him the low down so that he could testify against them, and thereby gain himself good graces with the Court and the Post Office Inspectors, so that he could be pardoned from Leavenworth Penitentiary; I handed Kirby my written statement so that he could read it over, which he did, the statement that I had been given by the Post Office Inspectors in Alton.

As an inducement to have me go along and testify against these defendants, they told me they would see that Joe Schrader would get a reward of $500.00 a piece for each defendant convicted, and that money would be split with me.

I have dictated the above statement of my own free will, and have read the same over after it has been transcribed, and it is true. I have made this statement in the presence of Warden Elmer J. Green, of the Illinois State Penitentiary; Mr. Charles R. Foster, Superintendent of Mails at the Illinois State Penitentiary, Joliet, Illinois; Mr. John J. Broderick, Secretary to Warden Green; Mr. Joseph B. McGlynn and Mr. John F. McGinnis. I would solemnly swear that the above statements are the truth, so help me God.            George Sturm.
    Jurat.

2 I, George Sturm, #1299, confined in the Illinois State Penitentiary, Joliet, Illinois, of my own free will and accord without prejudice or promise whatever want to make a full statement concerning the affidavit purported to have been made by me to Joseph B. McGlynn, John F. McGinnis, Jr., John L. Broderick and C. R. Foster, sworn to before Alice H. Tindall, Notary Public, in the Joliet, Illinois, Penitentiary, on the 5th day of August 1927.

In connection with this statement will say that it was not made by my dictation but by Attorneys McGlynn and McGinnis; that this is the first time I have ever read this statement, nor did I read the statement that was signed by me at the request of McGlynn and McGinnis on August 5, 1927, nor did I know its contents.

Joseph McGlynn Attorney, from East Saint Louis, Ill., told me that he would obtain my release from the Joliet Penitentiary one month after the Appellate Court reversed the decision of the lower court in the case of the Government vs. Ray Larrison et al., for the Alton Illinois Post Office burglary, committed May 12, 1924. He also promised me that he would deposit $2500.00 with Jimmy Peterman of Troy, Illinois, for me, which I was to receive before the case went to the Appellate Court. He also promised that he would have me transferred to Stateville Penitentiary immediately. McGlynn showed me a letter from Attorney General Carlson, which stated in part as follows:

* * * Anything you will do for Mr. McGlynn will be appreciated by,
                Oscar Carlson,
        Attorney General of Illinois.

The affiant further swears that none of the statements in the affidavit made August 5, 1927, to Attorney McGlynn and McGinnis concerning Post Office Inspectors Keefe and Theurer and J. G. Schrader are true, namely:

The statement that "If I didn't want to do a lot of time in Leavenworth, that I had better do what they told me."

The Statement that, "Schrader in taking me to Alton, Ill., named the defendants, Larrison, Dooling, Meyer, Marino, Melling, Adams and Simon and asked me to get acquainted with the rest of the mob that I did not know in order to identify them in court." The statement that I reported to the post office inspectors for four or five days at the Alton, Illinois, post office, is not true. The statement that I visited Alton, Illinois, in order to acquaint myself with the different places involved is not true. The facts are that I was in Alton, Illinois, many

fendants' affidavits tend to support their claim that the recantation was freely and voluntarily made by Merrill and upon his own suggestion and without any payment of money. The government's affidavits tend to establish the truthfulness of the testimony

times for weeks at a time since the year 1918, and I was well acquainted with all of the places long before I ever met the Inspectors and before I went into the Alton Post Office burglary with the other men who were convicted in that case. The statement that the post office inspectors handed me a typewritten statement already prepared beforehand in the Alton Post Office for my signature, which was signed in the presence of the postmaster and that they gave me a copy of this statement is not true, as no statement was signed at the Alton post office. The statement that I met Jackie Adams for the first time in my life in the Peoria Jail on February 22, 1926, is not true. The statement that my testimony at the trial of the Alton case was false and untrue and that I did not know, or do I now know, nor have I ever known anything about the Alton Post Office burglary, or any connection of the defendants in that trial with the Alton Post Office burglary, is not true, as I participated in this burglary with the defendants, and know that they are guilty.

The statement that I conspired with Jack Kirby to help him give false testimony in this case is untrue and I did not give Kirby a written statement so that he could familiarize with the case.

The statement that I was promised a split on the reward by the post office inspectors is not true, and the statement that J. G. Schrader promised me a part of a reward is not true.

The statement that I was shown the tarpaulin, rain coat and billiard table cover in the Federal Building at Springfield, Illinois, and that that was the first time I had ever seen those articles is not true.

The statement that I brought Simon to Springfield at the instigation of the inspectors so that they could place him under arrest is not true. I took Simon to Springfield on that occasion to get some hot diamonds.

On August 5, 1927, when the statement purported to have been made by me was written, Joseph McGlynn went to the toilet in the front part of the office off of the hall and when he came back he told me to go to the toilet and look down beside the bowl; that he had placed a $100.00 bill there for me. I went to the toilet and found the $100.00 bill where he said it was and brought it with me and kept it. I have $95.00 of it left and it is in the possession of one of the inmates.

The first man that came to see me in regard to the affidavit made by me was Jimmy Peterman. He owns a roadhouse just south of Troy, Illinois, on the hard road. He told me that Dick Mudge, Attorney, called him over to his office in Edwardsville, Illinois, where he met Mrs. Ray Larrison, Mrs. Joseph Marino and Mrs. Joseph Myers. He said that the three women agreed to pay me $2500.00 if I would contradict my testimony given in the trial of the Alton burglary case.　　　　George Sturm.

Jurat.

### Second and Later Government Affidavit.

I, George Sturm, #1299, confined in the Illinois State Pentitentiary, Joliet, Illinois, of my own free will and accord without prejudice or promise whatever want to make further explanation of the affidavit purported to have been made by me before Joseph McGlynn, and John F. McGinnis, on August 5, 1927.

There was a statement in that affidavit that I had attempted to get out a special letter to Joseph McGlynn about two months prior to the fifth of August 1927. That statement is not true. I never attempted to get out any letter to Joseph McGlynn concerning the Alton Post Office burglary or did I try to get out a letter to anyone else concerning such a matter.

Joseph McGlynn told me while he was here that he and McGinnis were going out to McNeils Island Penitentiary to interview Jack Kirby for the purpose of obtaining a statement from Kirby concerning the Alton Post Office burglary. McGinnis called upon me about three weeks ago and at that time informed me that they could not see their way clear to go to McNeils Island.

The first time I was approached on the subject of making an affidavit was when Jimmy Peterman came here to see me. He told me of the offer made by McGlynn and said he would have McGlynn come to see me. I never sent for McGlynn or anyone else, but McGlynn came to see me, promised me that he would have me released from the penitentiary within one month after the Appellate Court reversed the decision of the lower court, that he would deposit $2500.00 with Jimmy Peterman for me and that he would have me transferred to the new prison at Stateville, in the event that I would sign a statement to the effect that the testimony given by me at the trial in the Alton Post Office burglary case was not true.

This promise was made upon McGlynns first visit to me about July 30, 1927, when he talked to me alone for some time and promised me my liberty.

About one month after I was received at this penitentiary I was approached by the prison Priest. He told me that I had better come to confession; that he heard I had testified falsely against the men convicted on the Alton case, and that I had better confess to him. He also asked me to make an affidavit to him that I had testified falsely, advising that he would take the matter up personally. I refused and stated that my testimony given at the trial was true.

This statement concerns the case of the Government v. Ray Larrison et al. known as the Alton Post Office Burglary at Alton, Illinois, on May 12, 1924.

The visit made by Jimmy Peterman was about July 26, 1927, he made the preliminary offer to me, a few days later Joseph McGlynn came and this interview was held in the record office at which time he talked to me alone. When I speak of being alone, I mean that we were to one side and talked in such low tones that we were not overheard by others passing thru the room.

On August 5, 1927, Attorneys McGlynn and McGinnis came to see me. McGlynn first interviewed me in the audience room for about thirty minutes. He then told me to wait and about thirty minutes later I was called into the record room where they prepared the statement.　　　　George Sturm.

Jurat.

given by Merrill and Kirby on the trial and to discredit the first Merrill affidavit.

[1] The writ of error does not permit of a consideration of questions other than those presented to the District Court. In fact, this court must determine the assignments of error on the record as made in the District Court. Towle v. Pullen (C. C. A.) 238 F. 107, 111.

[2, 3] That the evidence amply supports the verdict, we have no doubt. For the unsupported testimony of an accomplice is sufficient to sustain a conviction. Allen v. U. S. (C. C. A.) 4 F.(2d) 688; U. S. v. Heitler (D. C.) 274 F. 401. Here there is the evidence of two accomplices, each supporting the other. Their stories are corroborated in part. No explanation other than a consciousness of guilt can account for the defendants' inquiry of the torch sold by Larrison. Moreover, no satisfactory explanation of how Larrison came into possession of the torch is offered.

Nor is there a word of testimony disputing the evidence showing that Jackie Adams is a professional safe blower, or his admission of guilt after arrest. The damaging effect of this testimony was allowed to go unchallenged evidently on the assumption that such facts were less damaging than those which would have been brought out on a cross-examination had he taken the witness stand. His profession, his acquaintance with the other defendants, his admission of guilt, stand undisputed.

Nowhere is there any satisfactory impeachment of Kirby's testimony. No satisfactory motive for his falsifying appears. On the other hand, there is corroboration in minor details that strengthens his testimony. It is true that both Kirby and Merrill were criminals with numerous jail records. Their careers, as admitted on the stand, are an impeachment of their testimony. On the other hand, the government cannot be condemned for offering them as witnesses. The crime charged was a serious felony. Respectable, law-abiding citizens were not engaged in burglarizing post offices. Those engaged in such occupation were of the criminal class. To ascertain and apprehend the guilty parties, it was necessary to trace the doings and follow the careers of criminals and their associates. It was not surprising therefore that, in this search, the investigators found some of the actors in the jails and penitentiaries of the country. If it be charged that Kirby and Merrill have criminal records, the government may well answer that defendants were their associates when they were at large.

Whether defendants' motion to return the record to the District Court should be granted depends, we think, upon the answer to the question, should the District Court grant a new trial upon the so-called newly discovered evidence?

If this question is answered in the negative, it would be idle to return the record for the purpose of passing upon a motion that must be denied. The statement of the various courts, confronted with a somewhat similar question is at least interesting. In many of the cases the facts differ widely from those of the instant case. We have found but few where there was such a clear repudiation of the recantation of the witness' testimony.

20 R. C. L. 299, dealing with perjury as the basis for a new trial, announced the following rules:

"Where a material witness admits under oath that his testimony was mistaken or false, a new trial, has in numerous cases, been granted. In some cases, however, such admission has been held insufficient to justify the conclusion that the evidence given by the witness on the trial was false." (For support of this statement, see People v. Tallmadge, 114 Cal. 427, 46 P. 282; People v. Shilitano, 218 N. Y. 161, 112 N. E. 733, L. R. A. 1916F, 1044.) "It has been declared that conviction of perjury or his death rendering conviction impossible is necessary." (For support of this statement see note to 51 L. R. A. [N. S.] 291.) "And in any case an admission of perjury will not call for a new trial, if, eliminating such evidence, there is still other evidence to support the judgment." (For cases supporting this view see note 51 L. R. A. [N. S.] 293.) "Moreover, where the party could have shown the perjured character of the adversary's testimony at the time of trial, a new trial has generally been denied on the ground that there must be an end of litigation."

[4] We agree with the court in Martin v. U. S. (C. C. A.) 17 F.(2d) 976, and hold that courts should not necessarily deny motions for new trials when the perjured testimony is merely cumulative. The fact that the testimony is cumulative only, should no doubt be considered, but it is not conclusive on the motion for new trial.

We shall approach this question on the assumption that a new trial should be granted when,

(a) The court is reasonably well satisfied that the testimony given by a material witness is false.

(b) That without it the jury *might* have reached a different conclusion.

(c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.

An interesting case is that of People v. Shilitano, supra, where the court makes this statement:

"Bearing in mind that the witnesses to crimes of violence are often of a low and degraded character and that after they have given their testimony they are sometimes influenced by bribery and other improper considerations, it is evident that the establishment of a rule which left the power to grant a new trial to a defendant to depend upon recantation by such witnesses would be subversive of the proper administration of justice. I do not wish to be understood as urging that the fact of recantation is not to be considered by the court in weighing the testimony upon which the defendant was convicted, but I wish to make clear the fact that recantation in and of itself does not necessarily require the court to order a new trial. Such being the case, whether or not a new trial should be granted must depend upon all the circumstances of the case, including the testimony of the witnesses for the people, submitted on the motion for a new trial, in which these witnesses recant the testimony which they gave upon the trial."

Speaking of the duty of the court where defendants have offered the sworn recantation statement of a witness for the prosecution the court says:

"But if, on the contrary, he (the judge) was convinced that the second testimony was false, that a criminal league had been formed to set at naught the verdict of the jury and the judgment of the court, his duty was clearly marked. He was not at liberty to shift upon the shoulders of another jury his own responsibility. That would have been to make the conspiracy triumphant. He was charged with the responsibility to seek the truth himself."

In the consideration of the affidavits and the testimony given upon the trial, all of which must be considered in disposing of the motion to return the record to the District Court, it is significant that:

(1) The trial which resulted in defendants' conviction was the second trial of this case. Both Merrill and Kirby testified at length on the first as well as the second trial. Defendants were therefore not surprised by their appearance as government witnesses nor by their evidence.

(2) The time that elapsed between the two trials permitted defendants to prepare any defense they had. Three of the defendants met these charges by silence—not even a denial of their guilt was made.

(3) Merrill's testimony was cumulative. There was evidence sufficient to convict all the defendants without his testimony.

(4) Merrill's recantation was obtained under circumstances which raised a grave doubt as to its reliability.

(5) He was twice given an opportunity to reaffirm or deny the statements appearing in the first affidavit. On both occasions, he disputed the first statement and reaffirmed the testimony he twice gave in open court and concerning which he was thoroughly cross-examined.

(6) The government's supporting affidavits tend strongly to destroy the probative value of the recantation.

[5] The testimony was cumulative. We are unable to find a motive for Kirby's fabricating. He corroborated in detail the Merrill testimony up to the time he was apprehended and removed from the scene of action. If he too fabricated his story, then its accord with Merrill's story is only explainable on the theory that the government investigators were in a conspiracy to suborn perjury. Their affidavits disproved this charge. One of them produced the original notes taken by him before this case was submitted to the grand jury. They show that Merrill told the same story then that he told on the witness stand. Unless the witnesses falsified, there is no basis for accepting Merrill's recantation.

If Kirby at Leavenworth, and Merrill at Springfield, gave in detail the story of the plan of the burglary and both involved the same parties, they must have told the truth. For if their stories were pure fabrication, then it is inconceivable that both, so far removed, would have fabricated alike.

The circumstances leading up to the execution of the recantation affidavit are not impressive. It does not satisfactorily appear how or why attorneys McGinnis and McGlynn called at the penitentiary. True, Merrill in his first affidavit says he sent a friend to McGinnis. The name of the friend does not appear. But defendants later submitted two affidavits, one from Peterman and one from Pelzallo. The latter stated that he asked Peterman "to accompany him on a trip to Chicago and while on said trip if he would go to see the said George Sturm or George Merrill and learn if he had anything to say regarding the said case." He further said that he learned from Peterman that Merrill

wished to see McGlynn. Peterman does not give his occupation but he is described in the affidavit of another as "owning a 'roadhouse' just outside of Troy." Ignoring other derogatory statements of Peterman, it is not clear why Pelzallo should take Peterman to Chicago on a trip to ask him to visit the penitentiary to ascertain whether Merrill wanted to recant. Nor is it understood why counsel should keep the existence of Merrill's affidavit a secret until a few hours before the case was called in this court.

In cases of this character, where the parties are dealing with witnesses of the criminal class, lodged in jail, a due regard for the ethics of the profession suggests that the side first learning that a witness wished to recant should advise his adversary of this information and then present it to the trial judge. If any examination or cross-examination of the witness is to take place, it should be done in the court room. The entrance of attorneys into the penitentiary as here disclosed that a convict might be interviewed and his statement used against him, is condemned. If there is reason to believe that a witness falsified and is ready or willing to make a confession, counsel for the accused should notify the district attorney and, if the latter too is convinced that false testimony was given on the trial, he should at once confess error that the injustice may be promptly corrected. If the district attorney be unconvinced, counsel for the accused may present the matter to the court.

It is stated by counsel for defendants that they received a letter from Merrill subsequent to their visit but it is not attached to the affidavit nor does its contents appear. This letter would have thrown light upon the possibility of Merrill's dictating to a stenographer the affidavit upon which defendants rely.

It is insisted that Merrill's recantation affidavit was, with the exception of the first sentences and the last paragraph, dictated by Merrill to a shorthand reporter. The language of the affidavit itself suggests the falsity of this statement. The letter referred to, however, would have indicated a scholarship that would have verified or disproved our impression respecting his ability to express himself in the manner disclosed by the affidavit.

For the reasons heretofore given, we deny defendants' motion to return the record to the District Court.

The judgment is affirmed.