See also, D.C.Cir., 675 F.2d 1341.

**UNITED STATES of America**

v.

**James L. SUTTON.**

**Crim. No. 80-370.**

United States District Court, District of Columbia.

May 10, 1982.

Timothy J. Reardon, III, Asst. U.S. Atty., Washington, D.C., for plaintiff.

Joseph A. Finlayson, Jr., Fort Washington, Md., for defendant.

## ORDER

JOYCE HENS GREEN, District Judge.

Defendant has moved, pursuant to Rule 33, Fed.R.Crim.P., for a new trial on the ground of newly discovered evidence. Attached to defendant's motion is an affidavit of Linda L. Harris, the daughter of a major government witness at defendant's trial, Madelaine (Pat) Harris. Defendant's motion asserts that the affidavit is evidence that certain documents which were admitted in evidence at trial, and which Madelaine Harris testified she falsified at defendant's office at his request, were in fact tampered with by Madelaine Harris in an evidence room in the United States Courthouse after they left defendant's possession and before the trial; and that certain testimony of Madelaine Harris was perjured. A hearing on this motion was held May 3, 1982, at which both Linda and Madelaine Harris testified. For several reasons, to be detailed below, a new trial is not warranted.

As background, this case was brought on a 35 count indictment charging one count of conspiracy, 32 counts of false statement to a federal agency, and two counts of obstruction of justice. All of the counts were related to a conspiracy by defendant and others to obtain funds improperly under the Basic Educational Opportunity Grant (BEOG) Program administered by the Department of Health, Education, and Welfare (HEW).[1] The conspiracy was designed to permit Monique Beauty Academy (Monique), of which defendant was owner and president, to retain grant funds for students who were or became ineligible for them. The evidence at trial showed that government grant monies were received and improperly retained for students who

either never attended at all, dropped out after a brief attendance, attended an ineligible branch of Monique, or enrolled in an ineligible course of study. When defendant was notified that Monique would be audited by HEW, and when its records were subpoenaed by the grand jury, he directed school employees to falsify documents in student folders. The indictment also charged that defendant had tried to persuade a Monique employee, Joyce Thompson, to testify falsely before the grand jury. After a trial beginning on November 24, 1980 and ending December 19, 1980, defendant was convicted by the jury on all 35 counts. On March 3, 1982 the judgment of this Court was affirmed by the United States Court of Appeals for the District of Columbia, 675 F.2d 1341.

The substance of Linda Harris' ("Linda") testimony at the hearing on this motion is that one day in May of 1979, (she was 17 years old at the time), her mother asked her if she wanted to accompany her to the courthouse. A government car picked them up in the morning and drove them to the courthouse. When they arrived, without securing permission to so do, her mother opened a drawer to a desk in the U.S. Attorney's Office and helped herself to a key to an "evidence room," which the two of them entered. Linda asked her mother why they were there. She had expected to watch a court case. Her mother explained that she came to work every day in the evidence room. Linda saw Monique Beauty Academy ledgers, which she recognized because she had spent time at the school, where she had seen the forms in the ledger books before. She also recognized some of the photographs of students on the forms. She saw her mother erasing things and writing things in the ledgers. Although, according to her testimony, she was not close enough to see what her mother was erasing or writing, she said that because of her familiarity with the way the forms were set up, she presumed that her mother

---

1. HEW has now been replaced by the Department of Health and Human Services and the Department of Education.

was erasing and writing in hours of attendance and tuition payments for students. She testified that she did not observe carefully anything that her mother did, because she was bored and annoyed at having been taken down to the courthouse for this purpose. Although she and her mother were in the courthouse a few hours (there are variances in the time periods described in her affidavit and in her testimony), she only actually watched her mother for 10 or 15 minutes total. The rest of the time, she doodled, talked on the phone, took walks in the halls, and went to get things to eat or drink. When Madelaine Harris finished working, she picked up a paycheck and they left. Although in her affidavit, Linda Harris stated that the same man in the government car who had driven them to the courthouse in the morning picked them up and drove them back to her house, she testified at the hearing that although that man was expected, when he didn't arrive after some time she and her mother took a bus to visit a friend of hers. At one point she testified that upon arrival that morning at the courthouse her mother had said to the driver: "See you tomorrow."

According to the affidavit and her testimony, Linda Harris was unaware of the court case against Mr. Sutton at that time, but she did know that he was under investigation. The affidavit states that after she later found out that Mr. Sutton was on trial, she asked her mother "why she had gone to court and besides lied against Mr. Sutton." Her mother answered that "she had to because they told her if she did not, she would go to jail because her signature was on the papers." Affidavit of Linda L. Harris, filed March 23, 1982. This statement was relied upon by defendant in his motion for the contention that Madelaine Harris perjured herself at the trial. Under cross-examination, however, Linda Harris admitted that her mother never told her that she lied in court, and that it was unclear from their exchange whether her mother meant only that she had to testify because her handwriting was on the papers and she would go to jail if she did not, or whether she meant that she had also lied in

court for that reason. Such an ambiguous statement cannot be support for a finding of perjury. All that remains of defendant's evidence of perjury is the allegation that Madelaine Harris altered documents that were introduced into evidence at trial, and then, it is implied but nowhere focused, lied about those documents in her testimony.

The affidavit of Madelaine Harris attached to the government's opposition to defendant's motion for a new trial and her testimony at the hearing contradict her daughter's affidavit and testimony in several respects. The major differences are that Madelaine Harris denies ever lying about the defendant either at the grand jury or at the trial, or ever indicating to her daughter in any manner that she had done so; and she denies altering or creating records of Monique Beauty Academy after they had come into the possession of the United States Attorney's Office.

According to her testimony, Madelaine Harris did come to the courthouse numerous times prior to her grand jury testimony regarding Monique at the request of the United States Attorney's Office and the F.B.I. Since she was the person most familiar with the Monique student folders, she was asked to go through them and write down what she remembered about each of them on yellow legal pads. On only one of these occasions she brought her daughter with her. Contrary to her daughter's testimony, she stated that she obtained the key to the evidence room from personnel at the U.S. Attorney's Office. She then entered with Linda and began to work, going through the folders and writing down on separate pieces of paper what had been falsified in each one. She flatly denied ever altering anything in the folders. She also testified that this was the only occasion on which she was left unsupervised in the evidence room for more than 10 or 15 minutes at a time; she was left for that shorter period once when the person escorting her went to park the car.

█ The standards for the grant of a new trial on the ground of newly discovered

evidence are as follows. 1. The evidence must have been unknown or unavailable to the defendant at the time of the trial. 2. Failure to learn of the evidence must not have been due to a lack of due diligence on the part of the defendant. 3. The evidence must be material and not merely cumulative or impeaching. 4. The evidence will probably result in an acquittal upon retrial of the defendant.[2] All of these standards must be met to justify the grant of a new trial. *United States v. Wright,* 625 F.2d 1017 (1st Cir.1980). A more lenient standard has been adopted in a minority of the judicial circuits where a material witness is alleged to have testified falsely at trial. A new trial is to be granted if the court is "reasonably well satisfied" that the testimony was false, and that without the false testimony, the jury "*might* have reached a different conclusion." *Larrison v. United States,* 24 F.2d 82, 87 (7th Cir.1928). The general rule in this Circuit is that a new trial will not be granted unless the newly discovered evidence would probably produce an acquittal upon retrial. The applicability of the *Larrison* standard to a situation where the new evidence shows that a government witness has committed perjury has not been decided. *United States v. Mackin,* 561 F.2d 958 (D.C.Cir.), *cert. denied,* 434 U.S. 959, 98 S.Ct. 490, 54 L.Ed.2d 319 (1977). As was the case in *Mackin,* we need not decide whether the more lenient standard of the *Larrison* case must be applied here, because under either standard, defendant's motion fails.

■ Although the government questions defendant's claimed lack of awareness of this "newly discovered evidence" until August of 1981 and his due diligence in learning of the evidence, and there are some disputes in the record as to facts relevant to this determination, the Court will assume for the purposes of this motion that defendant has met the first two criteria for the grant of a new trial described in the *Wright* case.[3] More significantly, the evidence does not meet the second two criteria. It is not material, but rather is merely impeaching, and it is not probable that the new evidence would result in defendant's acquittal upon retrial. Using the alternative *Larrison* standards, the Court is not reasonably well satisfied that Madelaine Harris' testimony at trial was false, which is the essential prerequisite for meeting the *Larrison* test.

■ In deciding a motion for a new trial based upon newly discovered evidence, the trial court has the power to weigh the evidence and assess the credibility of both the trial witnesses and those whose testimony constitutes the "new" evidence. *United States v. Wright; United States v. Davis,* 604 F.2d 474 (7th Cir.1979). In comparing the credibility of Madelaine Harris and Linda Harris, the only two persons actually witnessing the incident claimed to constitute the new evidence, it is clear that Madelaine Harris is by far the more credible. First, the Court had the opportunity to observe Madelaine Harris give lengthy testimony at the trial, much of which was corroborated by other witnesses. See p. 20, *infra.* She was an unusually credible witness. Secondly, while it appears unlikely that Madelaine Harris would have altered documents at the time alleged, Linda Harris had obvious psychological motives

---

**2.** This standard was impliedly approved by the Supreme Court in *United States v. Augurs,* 427 U.S. 97, 111 and n. 19, 96 S.Ct. 2392, 2401 and n. 19, 49 L.Ed.2d 342 (1976).

**3.** Although defendant stated in his pleadings and in his testimony at the hearing on this motion that he learned of this incident in August of 1981, while the appeal of this case was pending, it was not brought to the attention of the Court of Appeals. Mr. Sutton claimed that he contacted the counsel appointed to represent him on appeal concerning this matter, but was told to seek other counsel because his appellate counsel wanted to concentrate solely on the appeal. Defendant testified that he then (the exact timing was not disclosed) contacted Mr. Finlayson, who represents him for the purpose of the instant motion. However, the original motion for a new trial was not filed until March 23, 1982 (followed by an amended motion March 30), eight months after defendant learned of the evidence, and shortly after the Court of Appeals affirmed his conviction. Defendant has asserted, and it is not disputed, that he contacted the United States Attorney's Office shortly after he learned of the evidence.

to have either misperceived or misrepresented the situation. At the time Madelaine Harris allegedly altered Monique student records, she had already admitted to the authorities that she had been involved in extensive illegal alteration of those records in order to justify the receipt by Monique of BOEG monies to which it was not entitled. Whether or not she knew at the time of the alleged alterations that she had been granted informal immunity from prosecution for her part in the conspiracy, (she denied, at the hearing on this motion, even now knowing that she cannot be prosecuted for her actions), her motivation for further altering the records while in the possession on the United States Attorney's Office would be a mystery. In contrast, there is ample reason to believe that Linda Harris would be motivated to take action that would hurt her mother and help defendant. The testimony of both mother and daughter, though in disagreement on some particulars, is to the effect that Madelaine Harris and Linda Harris have had a stormy and mutually unhappy relationship for many years. Linda Harris testified that they never had a strong mother-daughter relationship, that they could not live together for any extended period of time, and that she resented her mother for divorcing a man she emotionally related to as her father. In describing how her mother favored an adopted child over her, she was reduced to tears on the witness stand. She also testified that she has had a few father figures in her life, one of whom was the defendant. She resided with the Suttons for various periods between the ages of 9 and 16, addressed the defendant at times as "Daddy," had an especially close relationship with the Suttons' daughter, and continued to occasionally spend weekends at their home. Her own daughter, born six months ago, was given the same middle name as the Suttons' daughter, who is informally the child's godmother. Linda Harris also testified that she did not believe that defendant would take money from the government, because he was "always honest" and "helped people."

Apart from the possibility of deliberate deception to assist defendant and hurt her mother, it is entirely likely that Linda Harris, with or without subconscious motivation, is simply mistaken about what she saw. Her own testimony pictured her as being totally disinterested in what her mother was doing, paying very little attention, and completely unaware of the possible significance of her mother's actions. The only truly material fact upon which the testimony of Madelaine and Linda Harris differs is that Madelaine Harris states that she was writing and making erasures on yellow legal pads next to the student records, while Linda Harris claims her mother was writing and erasing *on* the student records. While this detail is crucial in the context of this motion, and might appear at first blush to be one which would have made a strong impression on Linda Harris, according to her own testimony she had no idea of its significance until over two years later. She had no reason to take particular note of it, and may well have erred in either her original perception or her memory of it. In light of her claimed ignorance of the meaning of what she was witnessing, and her clear boredom with the entire matter, this particular observation on her part need be given no more credence than a number of other details about which her memory is faulty by her own admission. For example, her affidavit states that the same man in a government car who picked them up in the morning drove them to her house in the afternoon. In court, she testified that that was incorrect; they were not driven, but took the bus, and did not go home, but to visit a friend of hers. She further testified that she remembers nothing about the appearance of the man who drove them to the courthouse except that he was black. Also, the hours she said were spent in the evidence room are different in her affidavit and her testimony. While these memory failures certainly do not prove that she was wrong about any particular fact, they demonstrate the likelihood of error about another, in her view at the time, equally undistinguished fact. In contrast, Madelaine Harris knew precisely the significance of what she was doing at the time of this incident. She

simply could not be mistaken as to whether she altered the records or not. She could only be deliberately lying, and this appears, under all the circumstances, far less likely than the possibility that Linda Harris was mistaken.

Because Linda Harris' testimony is substantially less credible than Madelaine Harris', the Court is not "reasonably well satisfied" that Madelaine Harris' trial testimony was false, nor can it conclude that the new evidence would probably result in an acquittal on retrial. Even if this conclusion could not be drawn from a simple credibility contest between Linda and Madelaine Harris at the hearing on this motion, when viewed in the context of the entire trial, where extensive evidence was introduced against the defendant, including the testimony of several witnesses besides Harris, it becomes exceedingly unlikely that Madelaine Harris' trial testimony was false, or that the new evidence would produce a different verdict.

Peter A. Chaconas, a former lawyer and unindicted coconspirator,[4] testified in great detail concerning his participation with defendant and Madelaine Harris in the acquisition of BOEG grant money for numerous ineligible students. Tr. 457–528, *passim.* He also testified that defendant instructed Harris to falsify the student attendance records prior to an HEW audit, and that he knew that she had done so. Tr. at 532. Linda Veney, who worked for a few months at Monique's as a cashier and receptionist, testified that prior to the HEW review, Mr. Sutton asked her to forge a student's name on an affidavit. She refused. Tr. at 1093. She also testified that she knew that hours were recorded by Ms. Harris and sent in to the government for students who had never attended the school. Tr. at 1094. Mary Floyd, a former employee of Monique's, testified that she worked with Pat (Madelaine) Harris and others in the evenings prior to and during the HEW audit to "correct" the records. They wrote in hours to correspond with the number of hours that Pat Harris supplied. Defendant was present the entire

time. She knew it was wrong to put in hours without knowing how many hours there really were, but she didn't know that the totals were false. Tr. 1049–1055. Barbara Chamberlain, who kept the records at Monique's Georgetown School, testified that despite the fact that the school was ineligible, most of the students' there were on BOEG grants. Tr. at 997, 1003–1004. Joyce Thompson, who was a secretary to defendant at Monique's, testified that Mr. Sutton told her in January, 1979 that HEW was going to do an audit of the school's records, and she had to change the attendance records of all students at the Arlington, Virginia school who had less than 96 hours a month attendance to reflect 96 or more hours. Tr. 1205–1206. She falsified records in her spare time in addition to her other duties for a period of months at Mr. Sutton's direction. Tr. at 1208. After the grand jury subpoena for the attendance records at Monique's was issued, she was instructed by Mr. Sutton to change the records for the rest of the schools to reflect at least 96 hours a month for each student. She, Pat Harris, Mr. Sutton and another individual spent full days, and sometimes evenings, for about a week falsifying records. Tr. at 1211–1214.

In short, the evidence of defendant's guilt and in support of Madelaine Harris' testimony that she falsified the records that were introduced into evidence while they were in defendant's possession and at his direction is overwhelming. The newly discovered evidence offered here is merely impeaching and would not be likely to change the verdict.

Defendant's counsel emphasized in closing argument on this motion that Madelaine Harris was left alone with her daughter in the evidence room, with all the Monique documentary evidence, and had the opportunity to alter the records. Government counsel acknowledged that Ms. Harris' unsupervised presence in the evidence room was an "administrative error", but argued that it did not amount to cause for

---

**4.** He testified under a grant of immunity that did not include perjury, but had spoken to the FBI concerning these matters before he was granted immunity. Tr. at 425–426.

granting a new trial. While the United States Attorney's Office must be chastised for its lax procedures in this regard, the particular circumstances here do not justify the grant of a new trial.

Accordingly, for the reasons detailed herein, it is this 7th day of May, 1982, hereby

ORDERED, that defendant James L. Sutton's Amended Motion for a New Trial Based Upon Evidence Not Available at Previous Trial be, and it hereby is, denied, and it is

FURTHER ORDERED, that defendant present himself May 14, 1982, at 9:15 a.m. for the purpose of executing the sentence previously imposed by the Court on January 28, 1981 pursuant to the jury conviction on December 19, 1980.