**STATE of Delaware**

v.

**Joseph RUSSO, Defendant.**

**I.D. No. 93007979DI.**

Superior Court of Delaware,
New Castle County.

Submitted: Sept. 19, 1996.
Decided: Oct. 8, 1996.

Robert M. Goff, Deputy Attorney General, Wilmington, for the State.

Joseph Russo, of Delaware Correctional Center, Smyrna, Pro Se Defendant.

BARRON, Judge.

## I. INTRODUCTION

In October 1994, Joseph Russo (defendant) was tried and convicted of two counts of unlawful sexual intercourse in the first degree, five counts of unlawful sexual contact in the second degree and one count of unlawful sexual penetration in the third degree.[1] On December 2, 1994, the defendant was sentenced to life in prison plus 40 years, to be served consecutively. The convictions were affirmed on appeal. *Russo v. State,* Del. Supr., No. 471, 1994, 1995 WL 715870, Holland, J. (Nov. 27, 1995) (ORDER).

On July 12, 1996, the defendant filed a motion for a new trial. The defendant argues that he is entitled to a new trial on the grounds of (1) the alleged recantation of Christi Garber, who is the complaining witness as well as Russo's stepdaughter, and (2) ineffective representation by defense counsel at trial. As an alternative, the defendant requests an evidentiary hearing on these same issues. In support of his motion, the defendant has submitted numerous documents and affidavits, which the Court has considered in its resolution of the defendant's motion.[2] On August 16, 1996, the State filed

1. The defendant had been reindicted in December 1993, when the Grand Jury returned an indictment containing 20 separate counts. *See* IN93–12–1208 through 1227. Prior to trial, the State entered a *nolle prosequi* on Counts V through XVI. Counts XVII through XX were redesignated as Counts V through VIII in order to avoid jury confusion.

2. On August 5, 1996, after a hearing, this Court granted the defendant's motion to proceed *pro se,* finding that the defendant was competent to make such a decision, notwithstanding the ad-

its response, arguing that the complaining witness's trial testimony is fully corroborated by other evidence and that Russo has failed to show that he is entitled to a new trial.

Having reviewed the parties' submissions,[3] as well as the evidence of record, the Court concludes that the defendant has not met the established standard for a new trial, and the motion is therefore denied.

## II. DISCUSSION

### A. Motion for New Trial Based on Recantation of Complaining Witness

In his motion, the defendant argues that the State's main witness, Christi Garber, (who is the defendant's stepdaughter), has recanted her testimony against him, thereby entitling him to a new trial. In support of this argument, the defendant submits a notarized affidavit signed by Garber, in which she purports to retract all allegations of wrongdoing on the part of her stepfather. The affidavit provides as follows:

### Affidavit of Christi Garber

I, Christi Garber, swear the following statements are made under the penalty of perjury:

1. That I am Christi Garber, eighteen years of age, daughter of Marti Russo, and Stepdaughter of Joseph Russo.

2. That I reported a crime committed against myself by Joseph Russo to the police, and that this alleged crime never really occurred.

3. That I reported this crime when I was 15 years of age. When filing this police report, I was coerced into doing so by my neighbor, who was giving me drugs and alcohol.

4. That I called the prosecutor, Mr. O'Neill, before the trial of State v. Russo, and told him that I was not willing to testify against Joseph Russo because the allegations were false.

5. That I was told during this conversation by Mr. O'Neill that I was going to testify to what he told me or else he would put me in jail.

6. That the Prosecutor, Mr. O'Neill, did willfully coerce me to perjure myself at trial and falsely testify against Mr. Russo to get a conviction.

7. That I am now ready to face any consequences of my actions as a minor in allowing Mr. O'Neill to coerce me in to committing perjury in the trial of State v. Russo.

_____

Christi Garber (signed)

Russo contends that Garber, who is now an 18–year–old adult, regrets the testimony which she gave as a juvenile against her stepfather. In Russo's words, Garber "is trying to correct an injustice that was done to Mr. Russo by herself, O'Neill and the Delaware Judicial System."

**Standard for new trial based on witness recantation.** A motion for a new trial filed pursuant to Super.Ct.Crim.R. 33[4] is addressed to the sound discretion of the trial court. *Johnson v. State*, Del.Supr., No. 363, 1992, 1993 WL 245374, Holland, J. (June 22, 1993), citing *Hutchins v. State*, Del.Supr., 153 A.2d 204, 206 (1959). Rule 33 provides that a motion for a new trial may be based "on the ground of newly discovered evi-

vantages of attorney representation. The Court further found that the defendant's decision was made knowingly, intelligently and voluntarily. *State v. Russo*, Del.Super., I.D. No. 93007979DI, Barron, J. (Aug. 5, 1996) (ORDER).

3. The State, by letter dated September 19, 1996, decided that a reply to Russo's August 30, 1996, response was unnecessary.

4. Super.Ct.Crim.R. 33 provides as follows:

The court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice. If trial was by the court without a jury the court on motion of a defendant for a new trial may vacate the judgment if entered, take additional testimony and direct the entry of a new judgment. A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment, but if an appeal is pending the court may grant the motion only on remand of the case. A motion for a new trial based on any other grounds shall be made within 7 days after verdict or finding of guilty or within such further time as the court may fix during the 7–day period.

dence." If the newly discovered evidence is the recantation of a material witness, a new trial will be granted only when:

    (a) The Court is reasonably well satisfied that the testimony given by a material witness is false.

    (b) That without it the jury *might* have reached a different conclusion.

    (c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.

*Blankenship v. State,* Del.Supr., 447 A.2d 428, 433 (1982), quoting *Larrison v. United States,* 24 F.2d 82, 87–88 (7th Cir.1928) (emphasis in the original). Without explicitly adopting it, the Third Circuit has approved the use the so-called *Larrison* test. *See United States v. Massac,* 867 F.2d 174 (3d Cir.1989); *United States v. Meyers,* 484 F.2d 113 (3d Cir.1973).

The three prongs of the *Larrison* test build logically on one another, and the court need not proceed to the second and third prongs if the first prong is not met. *Montes v. State,* Del.Supr., No. 108, 1986, 1987 WL 35900, Christie, C.J. (Jan. 22, 1987) (ORDER) (affirming the denial of defendant's motion for a new trial where the trial court concluded that the recanting witness' trial testimony was "true and accurate, and the affidavit was wrong," and therefore did not reach the second and third prongs of the *Larrison* test).

■ A motion for a new trial based on a witness' recantation is generally viewed with suspicion. *Blankenship v. State,* 447 A.2d at 433. This is because a recantation has traditionally been viewed as the "product of prison atmosphere to be received with great caution." *Johnson v. State,* 410 A.2d at 1015. *See also United States v. Hamilton,* 559 F.2d 1370 (5th Cir.1977); *Larrison v. United States,* 24 F.2d at 88.

Even when the recantation is not the result of the prison atmosphere, a recantation is received with great caution in a sexual misconduct case when the recanting witness is a relative of the defendant. *See Braxton v. State,* Del.Supr., 479 A.2d 831, 834 (1984) (affirming the trial court's rejection of a juvenile witness's recantation in a rape case because it was the result of pressure from a relative); *Robinson v. State,* Del.Supr., No. 149, 1995, 1996 WL 69797, Holland, J. (Jan. 29, 1996) (ORDER) (stating that recantation by a relative is still viewed with great suspicion and holding that a post-trial admission of perjury by the defendant's brother was subject to the *Larrison* test).

■ In addition, the jury verdict of guilt warrants a presumption that the trial testimony was truthful and that the recanting testimony is not; the defendant bears the burden of showing by clear and convincing evidence that perjured testimony was used against him at trial. 58 Am.Jur.2d, New Trial § 440. *See also* 58 Am.Jur.2d, New Trial § 466; 51 A.L.R.3d 907, 77 A.L.R.4th 1031.

1. **First prong of *Larrison:* whether the Court is reasonably well satisfied that Garber's trial testimony was false.** To grant a motion for a new trial under the *Larrison* test, the Court must first be "reasonably well satisfied that the testimony given by a material witness is false." *Blankenship,* 447 A.2d at 433. Having presided over the defendant's trial, this Court had the opportunity to observe Garber testify and is therefore well-suited to assessing the credibility of her testimony at trial. *United States v. Provost,* 969 F.2d 617, 619–620 (8th Cir.1992) (stating that since judge deciding motion for new trial was same judge who presided over trial he was in the best position to conclude that recantation of defendant's half-sister was not credible in case of aggravated sexual abuse).

The Court found Garber to be a most credible witness. During direct examination, she demonstrated an excellent rapport with the prosecutor, Mr. O'Neill. This fact alone belies the current protestations of coercion and forced testimony. In addition, her responses to the questions from both the prosecutor and the defense were believable and rational. Based on her demeanor on both direct and cross examination, the Court found no reason whatsoever to doubt the truth of the allegations she raised against the defendant.

Nor has such a reason been presented to the Court in the instant motion.[5] To discredit Garber's credibility at trial, the defendant has submitted Garber's affidavit recanting in unspecified terms all allegations of sexual abuse on the part of her stepfather. *See* Section II, A., *supra.*

In determining the truth or falsehood of recantations similar to Garber's, courts have considered a multitude of factors, including, but not limited to, the following:

1. The appearance that the recantation resulted from pressure from other individuals, notably family members;

2. The appearance that the recantation was produced by remorse;

3. The fact that other evidence clearly supports the conviction; and

4. The fact that the evidence supports the original trial testimony, while the recantation lacks corroboration.

58 A.Jur.2d, New Trial § 442. Although these factors are not the only means by which a court can evaluate the credibility of a recantation, this Court uses them herein as guidelines. However, to avoid redundancy, the Court addresses evidence of family pressure and the witness's remorse (numbers 1 and 2 on the list) under the same heading, and similarly treats evidence in support of the conviction together with evidence in support of the trial testimony (numbers 3 and 4 on the list).

*Pressure from family members and witness's remorse.* In cases involving sexual crimes committed against juveniles by family members, the juvenile victim often changes his or her story as a result of pressure from relatives. This cycle of guilt and fear is described in the following passage written by a recognized expert in this field:

> *Whatever a child says about sexual abuse, she is likely to reverse it.* Beneath the anger of impulsive disclosure remains the ambivalence of guilt and the martyred obligation to preserve the family. In the chaotic aftermath of disclosure, the child discovers that the bedrock fears and threats underlying the secrecy are true. Her father abandons her and calls her a liar. Her mother does not believe her or decompensates into hysteria and rage....
>
> The message from the mother is very clear, often explicit. "Why do you insist on telling those awful stories about your father? If you send him to prison, we won't be a family anymore. We'll end up on welfare with no place to stay. Is that what you want to do to us?"
>
> Once again, the child bears the responsibility of either preserving or destroying the family. The role reversal continues with the "bad" choice being to tell the truth and the "good" choice being to capitulate and restore a lie for the sake of the family.
>
> *Unless there is special support for the child and immediate intervention to force responsibility on the father, the girl will follow the "normal" course and retract her complaint.* The girl "admits" she made up the story....
>
> This simple lie carries more credibility than the most explicit claims of incestuous

---

5. The defendant argues that his position is supported by this Court's decision in *State v. Chao*, Del.Super., Cr.A. Nos. IN–88–03–1021 to IN88–03–1025, IN88–03–1027, IN88–03–1028, and IN88–04–0832 to IN88–04–0836, 1995 WL 412364, Gebelein, J. (Feb. 17, 1995) (Mem.Op.). In *Chao*, this Court granted the defendant's motion for a new trial based on perjured testimony of one of the State's material witnesses. However, *Chao* is distinguishable on several grounds. First, the perjured testimony against Chao had been presented by Chen, the husband of the murder victim. To avoid public knowledge of his extra-marital affair with the defendant, Chen lied about the relationship at Chao's trial but contradicted himself at the subsequent trial of Chao's co-defendant. The State did not dispute that Chen had perjured himself. On these facts, the Court in *Chao* found that "the record shows that a material state witness perjured himself on a highly relevant issue in the case, motive." *Id.* at 3. In other words, the Court was reasonably well satisfied that the witness's trial testimony was false. *Larrison* at 87. Second, in *Chao*, the perjured witness had good reason to lie about his long-term love affair with the defendant; no such motivation exists in the case at bar. Third, the *Chao* case did not involve intra-family sexual abuse of a child, with the accompanying ambivalence of the child about testifying against a parent.

For these reasons, nothing in *Chao* lends support to Russo's position. To the contrary, the grounds for granting a new trial in *Chao* underscore the paucity of Russo's arguments.

entrapment. It confirms adult expectations that children cannot be trusted. It restores the precarious equilibrium of the family.

Roland C. Summit, M.D., *The Child Sexual Abuse Accommodation Syndrome,* Child Abuse & Neglect, Vol. 7, p. 188 (1983) (emphasis in original). This explanation of the accommodation syndrome shows that the victim capitulates to family pressure (most often exerted by the mother) and to the guilt caused by her sense that she is to blame for the family's hardship and turmoil. The record in the case at bar indicates that this is precisely what occurred in the Russo–Garber family. In fact, the Court is persuaded that the dynamics of the Russo/Garber family provide a classic example of the child sexual abuse accommodation syndrome, as described by Summit, *supra.*

The record shows that ever since December 1992, when Garber told her mother about the sexual abuse, Mrs. Russo made every effort to prevent Garber from disclosing the facts to anyone else and to force Garber to retract her statements once she had made them. Garber herself described her mother's repeated attempts to manipulate her and the negative psychological effect this had on Garber. The following specifics from Garber's trial testimony establish Mrs. Russo's pattern of manipulation.

Mrs. Russo told Garber that the problem was a family matter that should be handled without intervention from the authorities. (T1, 43–44).[6] When Delaware Child Protective Services (DCPS) contacted Garber in February 1993, she denied that any abuse had occurred because her mother had instructed her to do so. She followed her mother's orders because she felt pressured and did not want to be the cause of anything bad happening to the family. (T1, 44–45.) When Garber made a full disclosure of the abuse to Detective Hinson, she was placed in a shelter. Her mother was angry about the disclosure and rarely spoke to Garber during her stay at the shelter. She never visited Garber or brought her the clothes she needed. The result of her mother's attitude was that Garber felt that she had done something wrong. (T1, 50–52).

After Garber left the shelter, she resided with different persons prior to the defendant's trial. At each location, Mrs. Russo telephoned Garber to discourage her from testifying and to force her to retract the allegations. (T1, 52–53, 55, 56, 85–86, 89–91). Her mother threatened that the only way Garber would ever see her siblings again was to move back into her mother's home and refuse to testify against the defendant. (T1, 58). While Garber was separated from her family, Mrs. Russo did not send Garber a birthday card or a Christmas present. Her general attitude toward her daughter was unfriendly. (T1, 57–58). Garber stated that she felt unwanted after she made the disclosure about the abuse and that she received no support from her mother. (T1, 89–91).

The testimony of Detective Hinson confirms this view of Mrs. Russo' behavior and its effect on Garber. Detective Michele Hinson, who at the time of Russo's trial had worked in the Family Service Unit of the New Castle County Police Department for three and a half years, was assigned to the Russo/Garber investigation. Detective Hinson's primary responsibility during her tenure with the Family Service Unit has been the investigation of child sexual abuse cases. (T1, 123). During the course of her investigation into the Russo/Garber debacle, Detective Hinson interviewed the defendant, Mrs. Russo and Garber. Based on her training and experience in child abuse situations, Detective Hinson formed an impression of Mrs. Russo, as follows:

> [S]he was like sort of evasive when she was talking to me. It was like she was like stuck in the middle of—her husband was being accused of something and the victim was her daughter. It was, to my understanding, that she was trying to protect, you know, her husband and her daughter, and seek counseling for them and **not to pursue an arrest.**

6. Citations to the October 11, 1994, trial transcript will hereinafter be designated "T1, [page number]." Citations to the October 12, 1994, trial transcript will be designated "T2, [page number]."

(T2, 10–11) (emphasis added). Thus, Detective Hinson, who had observed families in this situation for three and a half years, formed an opinion, based on an in-person interview, that Mrs. Russo was trying to avoid an arrest. This Court found Detective Hinson to be a most credible witness.

Thus, the record clearly shows that Mrs. Russo's reaction to the problem she faced followed the typical pattern: "The message from the mother [of the victim of the abuse] is very clear, often explicit. 'Why do you insist on telling those awful stories about your father? If you send him to prison, we won't be a family anymore.'" Summitt, *supra*. Faced with the prospect of raising five children by herself, Mrs. Russo tried to manipulate her daughter into denying the abuse and declaring herself a liar. She persisted in this pattern from the time she first learned of the abuse until the time of trial.

The Court finds no evidence to suggest that Mrs. Russo changed her behavior after the defendant was imprisoned. In fact, there is reason to believe that the pressure intensified after the defendant was imprisoned and Garber moved back to Delaware in close proximity to her mother.

The defendant had his own reasons for hiding the truth. The record evidence shows that, like his wife, he attempted to keep Garber silent as long as possible. In his statement to Detective Hinson (which was admitted into evidence in redacted form), Russo said

Yes, but we, we were afraid, we were afraid to talk to anybody because, because I knew how they handled it with my [step] dad. We didn't feel that me going to jail maybe lose, lose the kids and the family tore apart, everything was the answer, we just, Chris agreed, my wife agreed, I agreed that we were going to talk about it. We were going to work it out.

Having seen his stepfather imprisoned for sexual abuse, Russo knew that he, too, could end up in prison. When Detective Hinson asked him if his wife had told Garber to lie to DCPS, the defendant responded as follows:

No ma'am. No ma'am. No ma'am. No. No. No one, no one told her not to. It was just, we thought it was something we could handle as a family because we, we felt that there was no way, there was no way to get help without, without the police being involved. We didn't want, we didn't want to put Chris through that. Chris didn't want to go through that and she said, I don't want my, I don't want my dad to go to jail. I just, it's a problem with our family and, and I want it to be handled as a family. . . .

These statements clearly show that Russo joined with his wife in conveying to Garber that the whole family would suffer if she revealed their secrets. The defendant's recent submissions to the Court in support of his motion for a new trial indicate that this pattern continued after Russo's incarceration.

In his submission to the Court dated August 30, 1996, the defendant argues that Garber, having reached the age of 18, now "regrets her actions as a juvenile" in testifying against the defendant. The Court accepts that Garber may regret the fact that her testimony helped lead to her stepfather's conviction and imprisonment. However, regret over the consequences does not mean that the allegations were false. To the contrary, remorse is one of the primary reasons for post-trial recantations. *See* 58 Am.Jur., New Trial § 442, *supra*. It is also part of the family dynamic that occurs when a child discloses abuse by an adult relative: "[T]he child bears the responsibility of either preserving or destroying the family. The role reversal continues with the 'bad' choice being to tell the truth and the 'good' choice being to capitulate and restore a lie for the sake of the family." Summit, *supra*.

Russo also points out that Garber (who was 16 at the time of the trial) is now an adult, who is self-supporting and lives in her own apartment. These facts do nothing to suggest that her trial testimony was untrue. In fact, inherent in these facts is the suggestion that even if Russo were released from prison and returned to live with his family, Garber knows that she would not be in danger of further abuse because she no longer

resides with the family.[7]

*Other evidence.* Other grounds for disbelieving a recantation are that the evidence supports the conviction and the original trial testimony. *See* 58 Am.Jur.2d, New Trial 442, *supra.* For example, the *Blankenship* Court agreed with the trial court's belief in the truthfulness of the recanting witness's trial testimony at least in part because it was supported by other evidence introduced at trial. *Blankenship v. State* 447 A.2d at 434.

In the case at bar, Garber's trial testimony was corroborated most significantly by the defendant's taped statement to Detective Hinson in which he readily acknowledged that he had sexually molested Garber.

The defendant's descriptions of the sexual abuse correlate in every material way with Garber's trial testimony. In order to highlight the fact that Russo and Garber independently provided similar accounts of the abuse, the Court presents the following sections of the redacted version of the statement which Russo gave to Detective Hinson on August 5, 1993:

Q Okay. The reason why I wanted you to come in today was because there were some allegations made by your step-daughter, Christi Garber. The allegations that she said, [redactions] she says that you have sexually molested her one way or another. Either by fondling, she said you started off by fondling her breasts and stomach and then you would, you advanced to placing your penis up against her vagina but she said there was no penetration. And then she said you made her perform oral sex on you but didn't do it on her. And also, you made her fondle your, your penis on several occasions. Do you recall this happening?

A Yes, ma'am.

Q Do you remember when that was? [8]

A Uh, let's see, five years in December.

Q And where did you all first move to?

A We stayed with my wife's dad for a little while. . . .

Q Did anything happen at her father's house?

A Um, no not, not, not at the house. I mean, we, we, we touched a few times when we was [unintelligible]. . . .

Q What happened [when you lived] at Brookmont Farms? Did the fondling continue?

A Uh, yes from time to time.

Q It was just fondling at Brookmont Farms?

A Yes.

Q You would touch her and she would touch you?

A Yes. . . .

Q And what happened [when you lived] at Breezewood?

---

7. As to the potential danger of exposing the other four children to Russo's sexual advances, Garber was no doubt aware that her stepfather saw her as the only child who, as he phrased it in his statement to Detective Hinson, shared "something special" with him. When Detective Hinson asked him why he let the abuse continue, Russo responded by saying that "I know you can't understand this but Christi is, Christi is not really my daughter" and that Russo himself had been sexually abused by his stepfather. He also stated that he would never abuse either his stepson Raymond (because "I'm not a queer") or his biological daughters (because "[i]t never would happen, never would happen"). Russo's statement was admitted into evidence at trial. For a discussion of its admissibility, *see* Section B1. and 2., *infra.*

In Garber's statement to Detective Hinson, she stated her belief that Russo molested her because she not was his biological daughter and, following this same logic, that he would not molest her half-sisters, who were Russo's biological daughters. The Court notes that the statement is consistent with Garber's trial testimony as well as Russo's statement, and provides no support for the instant motion.

8. Thus, in this portion of his statement, the defendant acknowledged having abused Garber since December 1988, when she was 10 years old. In the redacted portion of the statement, which Russo attached to his submission to the Court, the defendant acceded that the abuse began when Garber was 7 or 8 years old. He stated that the first incident took place when he was urinating outside and he "let [Garber] see it and let her touch it." In addition to making Garber touch him, Russo admitted to fondling the child's vagina on and off from the time she was 8 to 11 years old. Because the Russo's lived in Arkansas at this time, the State of Delaware did not prosecute Russo for these crimes. Nor was the jury ever made aware of their occurrence.

A  Just the same things.

Q  Just fon, just touching, fondling?

A  Yes

Q  You didn't place your penis up against her vagina but you didn't penetrate her?

A  Uh

Q  Did that start around that time? ...

A  I don't remember when I rubbed my penis against her leg.

Q  You would rub your penis against her vagina?

A  That, that's something that only was like once or twice. It wasn't, it wasn't nothing that was done all the time....

Q  Would you put your penis in her underwear or you just rubbed the outside of her clothes?

A  In her underwear....

Q  An what happened in Knollwood?

A  It

Q  The fondling continued?

A  Yes. Yes it did....

Q  What other things did you do?

A  It was, it, it, it, it's always been a where I, I'd, I'd I'd rub between, ma'am, I'm I'm I'm just, it's hard to talk to a woman, you know....

Q  Uh-huh. Just look at me as someone that you just want to get this all off your chest and confess to.

A  [Unintelligible] how bad I want to. You don't know how bad I've wanted to for a long, long, long time.... I (pause) don't think I'm making excuses. I'm, I'm, I'm, I'm, I'm fully, I'm fully willing to take responsibility for what I done....

Q  Did she perform oral sex on you?

A  No. No ma'am, I, I remember one time she said, do you want me to kiss it, Dad. It wasn't sticking in her mouth, you know [9]....

Q  What was it, curiosity on her part?

A  No ma'am. It, it started as curiosity and, and then it, as she got older, I mean like into her teens, it was, it was sometimes like I want, I want something special, some special privilege or something. So....[10]

Q  You said she would have wanted some special privilege? You mean Chrissy wanted it or you wanted it?

A  Noooo. (pause) When, when, when, when she, when she wanted....

Q  ... a special privilege then this is what happened?

A  Sometimes....

Q  Your wife never suspected? ...

A  Chris told my wife about this and my wife confronted me about it and I told her the truth and....

Q  Did you tell her everything that you're telling me? Did she know exactly what happened?

A  (pause) Pretty much so. I mean, I don't know, maybe not all of it.

Q  This was reported to Child Protective Services earlier, in the earlier part of this year. And um, Chrissy told them that it didn't happen. Do you know why she changed her mind?

A  Yeah. Yes, ma'am.

Q  Why did she change her mind?

A  Because she ...

Q  Did you tell her not to?

A  No, no, no, no.

Q  Did her mother tell her not to?

9. The Court notes that this denial of Garber performing oral sex on Russo conflicts with the defendant's answer to the first question presented here, when Detective Hinson listed all of Garber's allegations, including oral sex, and asked Russo if he recalled these things happening. Russo responded "Yes, ma'am."

In addition, the transcript of the final sentence in this answer reads, "It wasn't sticking it in her mouth, you know." After listening carefully to the tape recording of Russo's statement, the Court has deleted the second "it" from the typed version to reflect what Russo actually said. Thus, Russo equivocally confirmed that oral sex was one of the abusive acts he forced on his stepdaughter.

10. Russo's attempts to blame his stepdaughter for the sexual activity are both unconvincing and irrelevant. He implies that when she was very young, the molestation occurred because of Garber's curiosity. When she was somewhat older, Russo suggests that the sexual acts occurred because Garber wanted a "special privilege."

A No ma'am. No ma'am. No ma'am. No. No. No one, no one told her not to. It was just, we thought it was something we could handle as a family because we, we felt that there was no way, there was no way to get help without, without the police being involved. We didn't want, we didn't want to put Chris through that. Chris didn't want to go through that and she said, I don't want my, I don't want my dad to go to jail. I just, it's a problem with our family and, and I want it to be handled as a family and ever since, since December, you know, everything's, in fact, then nothing happened. It stopped.

Q Nothing happened three weeks ago? . . .

A Oh, ma'am oh, I know what, I know what you're talking about.

Q What happened?

A I, I get on Chris a lot about some of the clothes that she wears. . . . Because as developed as Chris is, some of the things get (pause) trashy looking. . . . And she had on a top where practically her whole breast was exposed and I guess, I, I, I remember saying something about, you know, you, you look, you look like some trashy go-go girl or something, you know, you. . . .

Q Did you put money in her top?

A Yeah. Yeah, but it, it wasn't like a sexual thing, you know. . . .

Q Well, what happened in the car?

A I would feel her breast or unbutton her pants and put my hand down her pants and she'd, for lack of a better term, jack me off.

These inculpatory statements, standing alone, attest to Russo's guilt. Not only do they establish the defendant's guilt, they also corroborate Garber's trial testimony in the following fundamental ways. Russo's victimization of Garber started with touching her breasts and stomach, progressed to digital penetration of her vagina, and culminated in

Russo rubbing his penis against her vagina and having Garber masturbate him. At least twice, Russo acknowledged that the abuse had included Garber performing oral sex on the defendant. Surrounding circumstances also correlate. Both Russo and Garber stated that they were not totally naked during these incidents, but their pants were down and Garber's breasts exposed. Both stated that the incidents occurred in the house and in the car, that Russo instructed Garber to keep the incidents a secret because he didn't want to go to prison, as his stepfather had done. Both stated that Russo provided Garber with candy, money or other privileges in return for the sexual acts. Finally, as the State correctly points out in its submission, the only difference in the two accounts is that Russo stated that the more serious abuse occurred only a few times, whereas Garber indicated that it happened repeatedly.

The Court concludes that Russo himself has provided the strongest possible corroborative evidence. He and Garber were the only two people present during these incidents, and their stories correlate in almost every particular.[11]

Other corroborative evidence was provided by Debra Burke, a family friend with whom Garber stayed after she left the Franklin Street Shelter. Burke testified that Garber stayed with Burke and her family from August 1993 through February 1994. (T1, 107–108). During that time, Garber confided to her that the defendant "would fondle her breasts and her vagina with his hands, and he would stick his fingers inside of her and he would rub her vagina with his penis, and she would have to perform oral sex on him . . . She [also] had to jerk him off." (T1, 108).

In regard to Garber's pre-trial retraction, Burke testified that Garber had explained that she had lied to DCPS about the oral sex because "her mother asked her to take it back, you know, say that didn't happen so they wouldn't charge him with a larger charge, like a penetration charge or something." (T1, 108–109). When asked whether she had observed the influence that Mrs.

---

**11.** In their unredacted statements, both the defendant and the victim said the sexual abuse started in Arkansas when Garber was 7 or 8 years old.

Russo had on Garber, Burke stated as follows:

> She would—she would be doubting herself, you know, about going through with this, and because her mother would tell her, you know, "Your brothers and sisters won't have their dad," and you know, all kinds of things bad would happen if Joe went to jail, and she tried—she wanted to change her mind and not go through with it, and she just seemed like she wanted to give up.

(T1, 110). When Garber returned to the Burke residence after visiting her mother, the Burkes talked with her to determine whether she wanted to "go through with it" or "just forget about it." (T1, 110). The Burkes attempted to discover how Garber felt and supported her in her decision. When asked on cross-examination whether Garber's choice was to pursue the charges, Burke responded, "Only as her decision; yes." (T1, 116). In other words, Burke was willing to support Garber in whatever decision she might make as to the charges against her stepfather.

This willingness to support Garber in either decision is also evident in the affidavit submitted by Russo with his motion and signed by Burke. Although Russo argues that the affidavit confirms his position that Garber fabricated the charges of sexual abuse, the Court finds otherwise. In fact, the affidavit reconfirms the truth of both Garber's and Burke's trial testimony. Burke testified at trial that when Garber spent time with her mother she felt confused about what to do because of the negative impact on the family. The truth of this assertion reappears in the affidavit. Burke states in the affidavit that Garber has had "an ongoing mother-daughter relationship with Martha Russo through the entire proceedings"; she also states that on February 24, 1996, Garber told her that "none of the allegations against Joseph Russo were true." In other words, Garber has now changed her story due to pressure from her mother, and Burke has chosen to support Garber's decision, exactly as she stated she would at trial.

The Court finds that the affidavit is credible to the extent that it reflects that Garber has changed her story, but this fact does not undermine the credibility of Garber's trial testimony. In fact, Garber's retraction fits the classic pattern of the recanting witness in a sex case, and Burke's affidavit merely confirms the fact that Garber has recanted.

■ As stated above, a recantation from the complaining witness in a sexual abuse case warrants caution as least as great as that applied to a recantation resulting from a "prison atmosphere." *See Braxton v. State,* 479 A.2d at 834. Based on the evidence presented at trial as well as the documented pattern of family pressure typically present in child sex abuse cases, the Court is satisfied that Garber's recantation resulted from (1) pressure exerted on her by her family and (2) remorse for her mother's situation and her father's imprisonment. *See* 58 Am. Jur., New Trial § 442, *supra.* Stated otherwise, the Court is not reasonably well-satisfied that Garber's trial testimony was false, and the defendant has therefore failed to meet the first prong of *Larrison.*

2. **Second and third prongs of *Larrison.*** The second prong requires that, if the Court is satisfied that the trial testimony of a recanting witness was false, without the recanted testimony, the jury *might* have reached a different conclusion; the third prong requires Russo to have been taken by surprise by the recanting witness's trial testimony. *Larrison v. United States,* 24 F.2d at 88 (emphasis in the original). When the court finds that the trial testimony was "true and accurate, and the affidavit was wrong," the court need not reach the second and third prongs of the *Larrison* test. *Montes v. State, supra. See also Johnson v. State, supra* (affirming trial court's denial of motion for new trial based solely on lack of credibility of minor victim's recantation of charges of sexual abuse against her father).

■ In the case at bar, the Court has determined that Garber's recantation is wholly lacking in credibility and that other corroborative evidence substantiates Garber's trial testimony. Although the Court is therefore not required to proceed any further with the inquiry, the following observations are in order. Even if a jury were to hear the contents of Garber's recantation as

contained in her affidavit, the same result would no doubt be reached. Garber's October 1994 trial testimony would be available for the jury's evaluation. Her statements to Detective Hinson and social workers would also come in under 11 *Del. C.* § 3507.[12] As to the third prong of *Larrison,* Russo himself described the same events to Detective Hinson. Surprise is therefore not even arguable.

For all the above reasons, the Court concludes that the defendant has not overcome the presumption that Garber's trial testimony was truthful and the recantation is not. 58 Am.Jur.2d, New Trial § 440. He has failed to meet the *Larrison* standard and therefore is not entitled to a new trial on grounds of Garber's recantation.

### B. Ineffective Assistance of Counsel

The defendant also argues that he is entitled to a new trial because his attorney failed to provide him with effective representation at trial. To support this claim, Russo argues that counsel (1) failed to acquire the documents which would have substantiated Russo's claim that he had taken prescription medication on the morning he gave his statement to Detective Hinson, (2) failed to pursue suppression of Russo's statement based on lack of voluntariness, (3) withdrew the suppression motion without consulting Russo, (4) should have moved to suppress the testimony of Deputy Deupree "as being hearsay and vindictive," and (5) generally failed to provide adequate representation. The Court discusses each of these arguments *seriatim.*

**The standard.** To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that counsel's errors were so grievous that his performance fell below an objective standard of reasonableness and (2) actual prejudice, that is, that there is a reasonable degree of probability that but for counsel's errors the outcome of the proceedings would have been different. *Strickland*

*v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Albury v. State,* Del. Supr., 551 A.2d 53 (1988). In making a claim of ineffective assistance of counsel, a defendant must make and substantiate concrete allegations of actual prejudice or risk summary dismissal. *Younger v. State,* Del.Supr., 580 A.2d 552, 556 (1990); *Robinson v. State,* Del.Supr., 562 A.2d 1184, 1185 (1989).

Although the *Strickland* standard is a two-part test, the showing of prejudice is so central to this claim that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland* at 697, 104 S.Ct. at 2069. In other words, if the court finds that there is no possibility of prejudice even if a defendant's allegations regarding counsel's representation were true, the claim may be dismissed on this basis alone.

■ **1. Failure to obtain documents substantiating defendant's ingestion of prescription medication on the morning he gave his statement to police.** Russo's first contention is that counsel should have obtained documentation of Russo's ingestion of medication before he gave his statement to Detective Hinson. For purposes of the instant motion, this Court accepts Russo's assertion that he had taken two tablets of Percocet on the morning he turned himself in and gave a statement to Detective Hinson. However, after reviewing the totality of the circumstances, the Court concludes that Russo had the capacity to know what he was saying and voluntarily intended to say it, despite the fact that he had taken two prescribed pain-killers. *Howard v. State,* Del. Supr., 458 A.2d 1180, 1183 (1983); *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1140–41, 89 L.Ed.2d 410 (1986). In making the voluntariness determination, the Court takes into account the defendant's written submissions relating to his medication, which

---

**12.** Eleven *Del.C.* § 3507 states, in pertinent part, as follows:

(a) In a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value.

(b) The rule in subsection (a) of this section shall apply regardless of whether the witness' in-court testimony is consistent with the prior statement or not. The rule shall likewise apply with or without a showing of surprise by the introducing party.

are, presumably, the documents Russo claims that counsel should have obtained at trial. Since the Court relies on these documents in concluding that Russo knowingly and voluntarily gave a statement to Detective Hinson without benefit of counsel, it cannot be said that the defendant suffered any prejudice from counsel's alleged failure to obtain that same documentation at trial. Even if counsel had submitted the desired documents in support of a motion to suppress at trial, the motion would have been denied because the documents do not establish any lack of voluntariness on Russo's part. Thus, this argument is disposed of "on the ground of lack of sufficient prejudice." *Strickland* at 697, 104 S.Ct. at 2069.

■ **2. Failure to pursue suppression of the defendant's statement based on lack of voluntariness.** The defendant asserts that his statement should have been suppressed because he was taking prescription drugs at the time he talked to Detective Hinson. In support of this argument, he has submitted (1) an affidavit from his stepson Raymond Garber, Jr., that he had given the defendant two Percocets on the morning of August 5, 1993, at approximately 8:15 a.m. and (2) product information pertaining to Percocet. Assuming, *arguendo*, that Russo did take two Percocet tablets within an hour of talking to Detective Hinson, he has nevertheless failed to explain how the medication affected him or to what degree it may have impaired his memory of his misconduct against his stepdaughter. Rather, he states in conclusory fashion that his statement should have been suppressed because he took his medication. This argument falls far short of the mark. The Court notes the following facts of record. The defendant turned himself in at approximately 9:00 a.m. At that time, Detective Hinson noted that he limped and walked with a cane. She found him to be responsive to her questions and formed a general impression that he was fine. She explicitly noted that he did not appear to be under the influence of alcohol or drugs. (T1, 124–125). Russo appeared to understand his *Miranda* rights, and Detective Hinson was of the opinion that Russo waived those rights knowingly and voluntarily. He came prepared to give a statement

and never wavered from that intention, even when he experienced difficulty articulating some of his misdeeds. Detective Hinson noted nothing unusual about Russo's eyes or speech. (T1, 127–129).

■ The *Miranda* warnings serve the important purpose of providing a defendant with notice of his privilege against self-incrimination and the also of the right to counsel. *Miranda v. Arizona*, 384 U.S. 436, 468–69, 86 S.Ct. 1602, 1624–25, 16 L.Ed.2d 694 (1966). Even when a defendant waives those safeguards, the law requires the waiver to be given knowingly, voluntarily and intelligently. *Howard v. State*, 458 A.2d at 1183. The Court reviews these issues under the "totality of the circumstances including the behavior of the interrogators, the conduct of the defendant, . . . and all other pertinent factors." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973); *Whalen v. State*, Del.Supr., 434 A.2d 1346, 1351 (1981).

■ A court may properly conclude that *Miranda* warnings have been waived if (1) the waiver was "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception" and (2) the defendant was fully aware of the rights abandoned. *Moran v. Burbine*, 475 U.S. at 421, 106 S.Ct. at 1140–41. In the case at bar, Russo came voluntarily to talk to Detective Hinson, who gave him a full reading of his *Miranda* rights. Russo stated not once but twice that he understood those rights. He further stated that having those rights in mind, he wished to make a statement to Detective Hinson.

■ The voluntariness of a *Miranda* waiver also depends on the absence of police overreaching, and not on any broad sense of "free choice." *Colorado v. Connelly*, 479 U.S. 157, 170, 107 S.Ct. 515, 523, 93 L.Ed.2d 473 (1986). If the defendant's will was overborne and his capacity for self-determination critically impaired, the use of his statement would offend due process. *Schneckloth v. Bustamonte*, 412 U.S. at 225, 93 S.Ct. at 2046–47; *State v. Rooks*, Del.Supr., 401 A.2d

943 (1979); *Shipley v. State,* Del.Supr., 570 A.2d 1159 (1990).

The defendant does not argue that Detective Hinson intimidated, coerced or deceived him into admitting his long history of sexual misconduct. The Court has carefully reviewed the record and finds no hint of coercion of any kind. The defendant simply asserts that his statement should have been suppressed because he had taken two Percocet tablets earlier that morning. According to the RX Advisor, which was attached to the defendant's August 30, 1996, submission, Percocet may cause drowsiness, dizziness or lightheadedness. The Physicians' Desk Reference lists Percocet as a pain reliever, not a psychotropic drug.[13]

Furthermore, Detective Hinson testified that on the morning Russo turned himself in, he appeared to be fine, that she noticed nothing unusual about his eyes or speech, that he understood his *Miranda* rights, and that he never wavered in his intention to give a statement. (T1, 126–127). During the initial stage of her interview with Russo, Hinson formed the opinion that Russo knowingly and voluntarily waived his *Miranda* rights. She also stated that he showed signs of relief when he made his statement. (T1, 127). On cross examination, Hinson reiterated that there was nothing unusual about Russo's eyes and that his speech was not slurred. (T1, 129). When asked by defense counsel if she had noticed "anything whatsoever about his demeanor or his condition or his speech, or any physical attribute that would lead you to believe he was on medication or under the influence or adversely impacted by something that may have seemed like he was not normal," Detective Hinson replied that she had not. (T1, 133–134).

From this evidence, the Court finds that even if the defendant had taken two Percocets and was drowsy when he gave his statement, he was not intoxicated or otherwise impaired, as his taped statement amply reflects. Furthermore, the fact that a defendant is intoxicated when he makes a taped statement "does not *per se* invalidate an otherwise proper waiver of rights.... Instead, the question is whether [the defendant] had sufficient capacity to know what he was saying and to have voluntarily intended to say it." *State v. Wright,* Del.Super., I.D. No. 91004136, Del Pesco, J. (Oct. 30, 1991) (Letter Op.), citing *Howard v. State,* 458 A.2d at 1183. *See also DeJesus v. State,* Del.Supr., 655 A.2d 1180, 1193 (1995) (finding waiver to be voluntary and intelligent despite defendant's contention that limited intelligence and use of prescribed pain-killers precluded him from making intelligent waiver).

Even assuming *arguendo* that Russo was "under the influence" of his pain medication at the time he gave his statement, "the use of drugs or the ingestion of alcoholic beverages does not in and of itself render a subsequent admission inadmissible.... It is one factor to be considered in determining the voluntariness of a statement." *State v. Brotman,* Del.Super., Cr.A. No. IN90–12–1622, 1991 WL 138421, Barron, J. (Jul. 11, 1991) (Mem. Op.), quoting *State v. Russo,* 3 Conn.App. 137, 485 A.2d 1335, 1341 (1985). The determinative issue is whether Russo had the capacity to know what he was saying and to have voluntarily intended to say it. *Howard v. State,* 458 A.2d at 1183; *Moran v. Burbine,* 475 U.S. at 421, 106 S.Ct. at 1140–41.

After reviewing the totality of the circumstances, the Court finds no evidence of overreaching on the part of the police or

---

13. According to the 1996 Edition of the Physicians' Desk Reference, Percocet's principal ingredient is oxycodone, a semisynthetic narcotic analgesic with multiple actions qualitatively similar to those of morphine. The principal actions of therapeutic value of the oxycodone in Percocet are anagesia and sedation. Percocet is indicated for the relief of moderate to moderately severe pain. The defendant's submission, dated August 30, 1996, indicates that he was taking Roxicet, a generic brand of Percocet.

Oxycodone may impair the mental and/or physical abilities required for the performance of potentially hazardous tasks such as driving a car or operating machinery. The most frequently observed adverse reactions include lightheadedness, dizziness, sedation, nausea and vomiting. Other adverse reactions include euphoria, dysphoria, constipation, skin rash and pruritus.

The usual dosage of Percocet is one tablet every 6 hours as needed for pain. A Percocet tablet consists of 5 mg. oxycodone hydrochloride and 325 mg. acetaminophen. The defendant's submission indicates that this was the composition of his medication.

intoxication on the part of the defendant. The Court therefore concludes by a preponderance of the evidence that the defendant had sufficient capacity to know what he was saying and to have said it voluntarily. *State v. Wright, supra.* It follows from this finding that defense counsel was not ineffective for withdrawing the motion to suppress.[14]

**3. Withdrawal of motion to suppress without consulting defendant.** Russo's third claim of ineffective representation is that counsel withdrew the motion to suppress Russo's statement without consulting Russo or "receiving his permission." However, the record shows otherwise. The *voir dire* questions posed to Detective Hinson by both the prosecutor and defense counsel established that Russo's demeanor in no way suggested that he was under the influence of any drugs or alcohol at the time he gave his statement and that Detective Hinson had not coerced him to speak. Following the **voir dire** questioning, the Court asked defense counsel if he had any more questions for the witness, and counsel responded by asking permission to pause for a moment, which the Court allowed. (T1, 134). The Court recalls that defense counsel then conferred with his client, and the record shows that during the pause, the Court stated, "Actually, while you're conferring, the Court has a couple of questions which might prompt others." (T1, 134). After asking Detective Hinson 18 questions, the Court turned to defense counsel and engaged in the following exchange:

> THE COURT: Have you sufficiently conferred with your client?
>
> DEFENSE: I believe so. Let me ask him if he has any questions.
>
> THE COURT: Are you going to call him to the stand on this issue.

DEFENSE COUNSEL: May I ask my client a question, Judge, and I'll answer that question afterwards:

THE COURT: Yes, you may. Thank you, Detective, you may step down.

(Pause)

DEFENSE COUNSEL: Judge, Mr. Russo and I have—as a matter of fact this morning, before trial, discussed his testimony at various dynamics with respect to various statements and how they might play with the jury, et cetera, and we discussed the argument or arguments we might make with respect to the statements if he were to testify, and I made a decision it would be in his best interest to not make those arguments at this time and that any—we're not going to contest the admission at this time of this document into evidence.

(T1, 137–138). Based on this record evidence that defense counsel conferred with Russo about his statement and the appropriateness of Russo taking the stand as well as withdrawing the suppression motion, the Court finds that Russo's allegation that counsel acted without Russo's knowledge or permission is completely unfounded. Thus Russo has not met the first prong of *Strickland* that counsel made an error so grievous that his performance fell below an objective standard of reasonableness. *Strickland* at 687, 104 S.Ct. at 2064. Furthermore, Russo cannot demonstrate any prejudice. If counsel had been persuaded by the defendant to persist with the suppression motion, it would have been denied and the result to Russo would have been unchanged. *Strickland* at 694, 104 S.Ct. at 2068. Thus, the defendant's

---

**14.** Russo makes two more assertions regarding his statement, neither of which is grounds for suppression. He challenges the admissibility of his statement because the transcript is not signed. There is not, nor has there ever been, an evidentiary rule requiring that a transcript of a statement taken by police officers must be signed by the defendant before being admitted into evidence. This argument is wholly without merit and borders on the frivolous.

He also argues that "on the tape, Mr. Russo vehemently denied the charges for which he was convicted." In redacted form, both the tape and the transcript were admitted into evidence at trial, and the Court reviewed them both upon receiving the defendant's motion. If the defendant is implying that the transcript does not accurately reflect the contents of the tape, he is mistaken; the transcript and the tape are exact replicas of each other, except as noted in footnote 9. Neither the tape nor the transcript contains any denials of the charges. To the contrary, the defendant admitted to Hinson all the acts Garber accused him of, including an equivocal acknowledgement of oral sex.

third claim of ineffective representation also fails.

**4. Failure to move to suppress testimony of Deputy Deupree.** Russo's fourth claim of ineffectiveness is that defense counsel "should have moved to suppress Deputy Deupree's entire testimony as being hearsay and vindictive." Deputy William Deupree, of the Washington County Police Department, Arkansas,[15] testified that on April 27, 1994, he responded to a report that a man (who was in fact Russo) was lying on the ground in a secluded rural area. When Deputy Deupree woke the man and asked him for his identification, he started to pull a loaded gun out of his pocket. At that point, Deputy Deupree grabbed him above the thumb, turned him clockwise, put him into a press bar, and handcuffed him.[16] (T2, 51–52).

■ Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." D.R.E. 801(c). Deputy Deupree testified as to the circumstances of Russo's arrest in Arkansas, including his own actions as well as his observations of Russo's actions and appearance. This testimony is not hearsay. Even if defense counsel had objected to it on grounds of hearsay, the objection would have been overruled.

■ When asked on direct examination to explain how he had apprehended Russo, Deputy Deupree responded as follows:

I asked the defendant to stand up so I could, you, evaluate how he stood and everything. I then asked him for ID. He said, "I have ID. I have to look for it". He then went through his—I believe it was his jacket pocket, some pants pocket and stuff, and I didn't know he had a trucker wallet with a chain to it, and he was going everywhere but that location. I asked if he had any weapons on him, and he goes, "What do you mean by 'weapons' ", and at that time his hand was in his pocket either to pull a gun out to aim it at me, or whatever his intentions were, I do not know.

(T2, 50). Although this passage contains two utterances which Russo made to Deupree, neither constitutes hearsay. Russo's second utterance was not an assertion; it was a question. A "statement" for the purposes of determining whether an utterance is hearsay is defined as "an oral or written assertion." D.R.E. 801(a). A question, by its very definition, is not an assertion.

■ Russo's first utterance, "I have ID. I have to look for it," is a statement. Yet it was uttered while reaching for a gun which was in his pocket. Thus, this statement qualifies as one made by a party and offered against him. As such, it does not constitute hearsay. D.R.E. 801(d)(2)(A).

■ It follows that, since neither utterance was hearsay, Russo's counsel's failure to object can hardly be characterized as falling below an objective standard of reasonableness.[17] *Strickland* at 687, 104 S.Ct. at 2064.

**15.** The defendant also contends that since no charges were brought against him by the State of Arkansas, he must have not broken any laws in Arkansas. Although this contention has no relevance whatsoever to the instant motion or to any of the proceedings against Russo in the State of Delaware, the Court notes that Deputy Deupree testified that under Arkansas law he could have charged Russo with "[c]arrying a concealed weapon and assault and battery of a police officer." (T2, 52). Although Deupree was not asked why those charges were not brought, it is self evident that when the Arkansas authorities learned of the more serious charges pending against Russo in Delaware they chose not to initiate a prosecution in Arkansas.

**16.** Deputy Deupree's report of this incident, which was not introduced into evidence, indicates that when Russo was informed of the out-

standing warrant against him from Delaware, he responded, "I should have killed the little bitch." In his motion, the defendant contends that this Court disallowed the State from introducing this statement on grounds that it was hearsay. In fact, the State did not seek to introduce this statement, and the Court was therefore not called upon to rule on its admissibility.

**17.** Even if one or both of these utterances does constitute hearsay, they were, when considered separately or together, so innocuous in the context in which they were used that the outcome of the case would have been no different had they been ruled inadmissible. The defendant suffered no prejudice by their inclusion in Officer Deupree's recitation of the circumstances surrounding Russo's apprehension in Arkansas. *Strickland* at 694, 104 S.Ct. at 2068.

The defendant also objects to Deupree's testimony on the grounds that it was vindictive. Russo does not elaborate on his meaning, and the Court therefore assumes that he is attempting to argue that Deupree's testimony was unfairly prejudicial or irrelevant. The State offered this testimony as evidence of Russo's consciousness of guilt insofar as he fled from Delaware shortly before his first scheduled trial date. Defense counsel argued forcefully against the admissibility of this evidence. (T2, 31–33, 39–41, 44). However, the Court concluded that the evidence of flight was relevant as showing consciousness of guilt and gave a limiting instruction to the jury as required under *Getz v. State*, Del.Supr., 538 A.2d 726, 734–35 (1988). (T2, 61). The Delaware Supreme Court affirmed, finding no error in admitting the evidence of flight on the facts of this case. *Russo v. State, supra.*

**▪ 4. Inadequate representation.** In addition to his specific allegations of ineffectiveness, Russo contends that "due to the absence of professional and certainly adequate representation at Mr. Russo's trial, only one side of the picture was seen, and it was distorted, at best." The Court disagrees.

A review of the trial transcript shows that defense counsel called five witnesses for the purpose of discrediting the victim's allegations of sexual molestation. Throughout the trial, defense counsel emphasized the fact that Garber had changed her story several times before the trial started. The defense had the difficult task of convincing the jury that Russo did not commit the acts to which he confessed in the taped statement. Counsel took advantage of the weakness in the State's case that Russo did not describe having oral sex with Garber but merely assented to recalling it, along with the other acts of sexual abuse. Thus, defense counsel put the prosecution to its proof in exploiting this weakness. *See Flamer v. Delaware*, 68 F.3d 710, 729 (3rd Cir.1995), *cert. denied*, 516 U.S. ——, 116 S.Ct. 807, 133 L.Ed.2d 754. The defense formulated and carried out a sound trial strategy: tacit admission of the lesser charges in view of the defendant's partial confession, coupled with a vigorous denial of unlawful sexual intercourse.

**▪** The Court finds that defense counsel fairly and zealously advanced Russo's interests, and that defendant has failed to show that counsel's representation fell below an objective standard of reasonableness or that he suffered prejudice from counsel's alleged errors. *Strickland* at 687, 694, 104 S.Ct. at 2064, 2068. Having found that Russo failed to meet the *Strickland* test, the Court concludes that Russo is not entitled to a new trial on the grounds of ineffective assistance of counsel.[18]

18. At trial, Garber's out-of-court statement was introduced into evidence through Detective Hinson, after Garber had been excused from the witness stand. The statement came in under 11 *Del.C.* § 3507. Almost one year later, the Delaware Supreme Court held that § 3507 requires that the out-of-court statement must be offered into evidence no later than at the conclusion of the direct examination of the declarant. *Smith v. State*, Del.Supr., 669 A.2d 1 (1995). Assuming a retroactive application of *Smith*, this Court is satisfied that the defendant was not prejudiced by the untimely admission of Garber's statement for the following reasons.

First, as in *Smith*, no objection to the timing was raised at trial, and plain error is therefore the applicable standard: "[u]nder the plain error standard of review, the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process." *Id.* at 6. *See also Weedon v. State*, Del.Supr., 647 A.2d 1078, 1083 (1994). During Garber's direct examination, she stated that she had given a voluntary statement to De-

tective Hinson. *See Hatcher v. State*, Del.Supr., 337 A.2d 30 (1975). Garber testified that she told Hinson everything that had happened. In her direct testimony, she touched upon both the events perceived and the out-of-court statement itself. *Keys v. State*, Del.Supr., 337 A.2d 18 (1975); *Feleke v. State*, Del.Supr., 620 A.2d 222 (1993). In his cross-examination of Garber, defense counsel questioned her about portions of her statement to the police. Thus, this was not a case where "the defendant was forced to call the declarant as his own witness if he wanted to examine the declarant about the statement." *Smith v. State*, 669 A.2d at 7.

Second, the State's case was extremely strong even without the taped statement, which merely reiterated Garber's live testimony. Furthermore, unlike the *Smith* case, Russo gave a confession which was also admitted into evidence. Thus, none of the concerns in *Smith* were present at Russo's trial. The Court is therefore satisfied that the untimely introduction of Garber's statement did not deprive Russo of a fair trial or

### III. EVIDENTIARY HEARING

The defendant has moved for a new trial, or, in the alternative, an evidentiary hearing. Generally, "a motion based upon a recantation is ordinarily decided without a hearing." *Blankenship v. State,* 447 A.2d at 435, quoting 8A Moore's Federal Practice § 3305 (1977). The trial court may decide a motion for a new trial based on the affidavits only. *Id.,* citing *United States v. Curry,* 497 F.2d 99, (5th Cir.), *cert. denied,* 419 U.S. 1035, 95 S.Ct. 519, 42 L.Ed.2d 311 (1974). When an evidentiary hearing is required, it is because of certain unique situations, usually involving allegations of jury tampering, prosecutorial misconduct or third party confession. *United States v. Hamilton,* 559 F.2d at 1373. However, even when such allegations have been made, an evidentiary hearing is not a requirement:

> [a]lthough we did note in *Hamilton* that evidentiary hearings are usually ordered because of "certain unique situations typically involving allegations of jury tampering, prosecutorial misconduct, or third party confession," we did not hold that any of those circumstances would compel such a hearing.

*United States v. MMR Corp.,* 954 F.2d 1040 (5th Cir.1992). Similarly, in *United States v. Chagra,* 735 F.2d 870, 875 (5th Cir.1984), the Fifth Circuit affirmed the trial court's denial of a motion for a new trial without an evidentiary hearing despite charges of prosecutorial misconduct where a material witness allegedly recanted his testimony and the defendant claimed that the prosecutor had knowingly presented the allegedly false testimony at trial. In both *Chagra* and *MMR,* the trial court had concluded that "a thorough inquiry into the basis of the motion could be conducted without an evidentiary hearing" because the motion was not based on newly discovered evidence in the sense of matters not discussed at trial but rather on a witness's supposed recantation. *MMR* at 1046. Under these circumstances, "the acumen gained by the trial judge in presiding over the course of the trial makes Rule 33 motions directed to the same judge 'particularly suitable for ruling without a hearing.'" *Id.,* quoting *Hamilton,* 559 F.2d at 1373. Similarly, in the case at bar, the defendant's motion for a new trial is not predicated on newly discovered evidence but solely on Garber's alleged recantation, which this Court is particularly suited to addressing without a hearing, having presided over the trial. For these reasons, the Court denies the request for an evidentiary hearing regarding Garber's trial testimony.

Furthermore, the Court's denial of Russo's motion for a new trial is not based on a finding of an absence of prosecutorial misconduct.[19] Rather, the motion is denied based on the Court's finding that the recantation was not credible in light of Garber's credibility at trial, and the substantial corroborative evidence presented, most notably in Russo's lengthy statement to Detective Hinson. Thus, a hearing is not required because "the court did not rely on the absence of prosecutorial misconduct in denying the motion." *United States v. MMR,* 954 F.2d at 1046.

In the case at bar, an evidentiary hearing would not destroy Garber's credibility at trial, or negate the combined impact of Garber's forceful assertions that Russo sexually abused her and Russo's corroborative confession. The Court therefore finds that the motion for a new trial, viewed in light of the underlying facts of this case, is ripe for decision without an evidentiary hearing.

### IV. CONCLUSION

The Court finds that the defendant has not shown by clear and convincing evidence that Garber's trial testimony was false. In fact, her testimony was corroborated in every material aspect by the defendant's taped statement. There is nothing either in the record or in defendant's motion to cast doubt on the conclusion that Russo sexually abused his

---

otherwise undermine the integrity of the trial process.

**19.** Although the Court does not base its denial of Russo's motion for a new trial on a finding of lack of coercion on the part of the prosecutor, Robert O'Neill, Esquire, the Court notes that Mr. O'Neill has a well-deserved reputation for honesty, integrity and fair-dealing.

stepdaughter over a period of years. Under the *Larrison* test, if the court is not "reasonably well satisfied that the testimony given by a material witness if false," it is appropriate for the court to deny a defendant's motion for a new trial without reaching the second and third prongs of *Larrison. Montes v. State, supra.* Nor has Russo met the *Strickland* standard for ineffective assistance of counsel. It follows that the defendant's motion for a new trial should be and hereby is ***DENIED.***

*It Is So **ORDERED.***